**JENNER & BLOCK LLP**
Alexander M. Smith (SBN 295187)
asmith@jenner.com
Kelly M. Morrison (SBN 255513)
kmorrison@jenner.com
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2054
Telephone:    (213) 239-5100
Facsimile:    (213) 239-5199

Dean N. Panos (*pro hac vice*)
dpanos@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Telephone:    (312) 222-9350
Facsimile:    (312) 527-0484

Attorneys for Defendant
TC Heartland LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN PRESCOTT, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>  v.<br><br>TC HEARTLAND, LLC,<br><br>      Defendant. | Case 5:23-cv-04192-PCP<br><br>The Honorable P. Casey Pitts<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Hearing Date: January 18, 2024<br>Hearing Time: 10:00 a.m.<br>Courtroom:  8 (San Jose) |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on January 18, 2024, at 10:00 a.m., or as soon thereafter as the Court is available, in Courtroom 8 of the federal courthouse located at 280 South First Street, San Jose, CA, 95113, Defendant TC Heartland, LLC will, and hereby does, move to dismiss Plaintiff Steven Prescott's Class Action Complaint because it (i) fails to state a plausible claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), and (ii) fails to plead an injury-in-fact, mandating dismissal under Federal Rule of Civil Procedure 12(b)(1).

TC Heartland's Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the attached Appendix, the concurrently submitted Request for Judicial Notice, Declaration of Alexander M. Smith, and exhibits attached thereto, any additional briefing on this subject (including TC Heartland's reply brief), and the evidence and arguments that will be presented to the Court at the hearing on this matter.

DATED: October 17, 2023             JENNER & BLOCK LLP

By:     <u>/s/ Dean N. Panos</u>
        Dean N. Panos
        Alexander M. Smith
        Kelly M. Morrison

        Attorneys for Defendant
        TC Heartland LLC

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND STATEMENT OF ISSUES ...................................................................1

BACKGROUND ........................................................................................................................3

I.     After Evaluating More Than 100 Studies and Clinical Trials, the FDA Approved Sucralose as Safe for Human Consumption—And Recently Reaffirmed That Sucralose Remains Safe..........3

II.    Allegations of the Complaint. ..........................................................................................5

ARGUMENT ..............................................................................................................................7

I.     The FDA's Determination That Sucralose Is Safe for Consumers With and Without Diabetes Preempts Plaintiff's Claims, Which Seek to Second-Guess That Determination. ..............7

II.    The FDA's Determination That Sucralose Is Safe Renders Plaintiff's Claims Implausible. ...........11

      A.    The FDA's finding that sucralose is safe for consumption and serves a "special dietary use" in the management of diabetes defeats the factual premise of Plaintiff's claims. ...................11

      B.    The studies Plaintiff cites do not support his claim that sucralose is unsafe. ..........................13

          1.    The studies Plaintiff cites do not establish causation or foreclose reverse causation.....15

          2.    Many of Plaintiff's cited studies do not involve the Products—or even sucralose. .......17

          3.    Plaintiff's cited studies do not account for the *amount* of sucralose consumers use......18

          4.    Findings from animal studies cannot be extrapolated to humans. ...................................19

III.    Plaintiff's Claims of Economic Injury Are Neither Cognizable Nor Plausible..............................20

      A.    Absent any plausible allegation that sucralose is unsafe, Plaintiff has not suffered any cognizable physical or economic injury and therefore lacks Article III standing. .................20

      B.    The Products' labeling is not likely to mislead reasonable consumers. ...................................22

CONCLUSION...........................................................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Alamilla v. Hain Celestial Grp., Inc.*,

5
    30 F. Supp. 3d 943 (N.D. Cal. 2014) ........................................................................... 13, 14

6

*Amado v. Procter & Gamble Co.*,
    No. 22-5427, 2023 WL 3898984 (N.D. Cal. June 8, 2023) ................................................ 14

7

8

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................................................. 8

9

*Ashcroft v. Iqbal*,

10
    556 U.S. 662 (2009) ............................................................................................................. 7

11

*Backus v. Gen. Mills, Inc.*,
    122 F. Supp. 3d 909 (N.D. Cal. 2015) ............................................................................... 13

12

13

*Becerra v. Coca-Cola Co.*,
    No. 17-5916, 2018 WL 1070823 (N.D. Cal. Feb. 27, 2018) .............................................. 14

14

*Becerra v. Dr. Pepper/Seven-Up, Inc.*,

15
    945 F.3d 1225 (9th Cir. 2019) ............................................................................... 14, 22, 23

16

*Becerra v. Dr. Pepper/Seven-Up, Inc.*,
    No. 17-5921, 2018 WL 1569697 (N.D. Cal. Mar. 30, 2018) ...................................... 14, 16

17

18

*Bowen v. Energizer Holdings, Inc.*,
    No. 21-4356, 2023 WL 1786731 (C.D. Cal. Jan. 5, 2023) ................................................ 12

19

*Boysen v. Walgreen Co.*,

20
    No. 11-6262, 2012 WL 2953069 (N.D. Cal. July 19, 2012) ........................................ 20, 21

21

*C.W. v. Textron, Inc.*,
    807 F.3d 827 (7th Cir. 2015) .............................................................................................. 18

22

23

*C.W. v. Textron, Inc.*,
    No. 10-87, 2014 WL 1047940 (N.D. Ind. Mar. 17, 2014) ................................................ 18

24

*Chikovsky v. Ortho Pharm. Corp.*,

25
    832 F. Supp. 341 (S.D. Fla. 1993) .................................................................................... 18

26

*Chobani, LLC v. Dannon Co.*,
    157 F. Supp. 3d 190 (N.D.N.Y. 2016) ......................................................................... 11, 12

27

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,

28
    563 F. Supp. 1122 (D. Del. 1983) .................................................................................... 9, 25

*Cohen v. Apple Inc.*,
  46 F.4th 1012 (9th Cir. 2022) .................................................................8, 9, 10, 11

*Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ................................................................................19

*Eckler v. Wal-Mart Stores, Inc.*,
  No. 12-727, 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012) ............................14, 17

*Excevarria v. Dr. Pepper Snapple Grp., Inc.*,
  764 F. App'x 108 (2d Cir. 2019) .........................................................................14

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ...........................................................................23, 24

*Geffner v. Coca-Cola Co.*,
  343 F. Supp. 3d 246 (S.D.N.Y. 2018) ............................................................13, 17

*Geffner v. Coca-Cola Co.*,
  928 F.3d 198 (2d Cir. 2019)..................................................................................14

*Geier v. Am. Honda Motor Co.*,
  529 U.S. 861 (2000).................................................................................................7

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
  No. 21-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022)..............................8, 21

*Girard v. Toyota Motor Sales, U.S.A., Inc.*,
  316 F. App'x 561 (9th Cir. 2008) .........................................................................22

*Gordon v. Church & Dwight Co.*,
  No. 09-5585, 2010 WL 1341184 (N.D. Cal. Apr. 2, 2010) ...................................8

*Hairston v. S. Beach Beverage Co.*,
  No. 12-1429, 2012 WL 1893818 (C.D. Cal. May 18, 2012) ................................23

*Herrington v. Johnson & Johnson Consumer Cos.*,
  No. 09-1597, 2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) ...........................11, 12

*Hodges v. King's Hawaiian Bakery W., Inc.*,
  No. 21-4541, 2021 WL 5178826 (N.D. Cal. Nov. 8, 2021) ..................................24

*Horti v. Nestle HealthCare Nutrition, Inc.*,
  No. 21-9812, 2022 WL 16748613 (N.D. Cal. Nov. 7, 2022) ....................23, 24, 25

*Kardovich v. Pfizer, Inc.*,
  97 F. Supp. 3d 131 (E.D.N.Y. 2015) ....................................................................14

*Kennard v. Kellogg Sales Co.*,
  No. 21-7211, 2022 WL 4241659 (N.D. Cal. Sept. 14, 2022) ...............................24

*Kimca v. Sprout Foods, Inc.*,
    No. 21-12977, 2022 WL 1213488 (D.N.J. Apr. 25, 2022)...........................................12, 21

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x 257 (3d Cir. 2010) ....................................................................................12

*Kwan v. SanMedica Int'l*,
    854 F.3d 1088 (9th Cir. 2017) ...................................................................................7, 15

*Kwan v. SanMedica Int'l, LLC*,
    No. 14-3287, 2015 WL 848868 (N.D. Cal. Feb. 25, 2015) .......................................13, 17

*Mahler v. Vitamin Shoppe Indus., Inc.*,
    No. 19-3848, 2023 WL 6141369 (N.D. Ill. Sept. 20, 2023) ...........................................18

*Manuel v. Pepsi-Cola Co.*,
    763 F. App'x 108 (2d Cir. 2019) ..............................................................................14, 16

*Manuel v. Pepsi-Cola Co.*,
    No. 17-7955, 2018 WL 2269247 (S.D.N.Y. May 17, 2018) .......................................16, 17

*McGinity v. Procter & Gamble Co.*,
    69 F.4th 1093 (9th Cir. 2023) .......................................................................................23

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
    950 F. Supp. 981 (C.D. Cal. 1996) ................................................................................18

*Satchell v. Sonic Notify, Inc.*,
    234 F. Supp. 3d 996 (N.D. Cal. 2017) ...........................................................................22

*Simpson v. California Pizza Kitchen, Inc.*,
    989 F. Supp. 2d 1015 (S.D. Cal. 2013)..........................................................................21

*Solis v. Coty Inc.*,
    No. 22-400, 2023 WL 2394640 (S.D. Cal. Mar. 7, 2023) ................................................24

*Spector v. Mondelēz Int'l, Inc.*,
    No. 15-4298, 2017 WL 4283711 (N.D. Ill. Sept. 27, 2017)........................................15, 18

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)....................................................................................................20

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
    No. 04-10077, 2008 WL 11338092 (C.D. Cal. July 21, 2008).........................................19

*Thomas v. Costco Wholesale Corp.*,
    No. 21-55335, 2022 WL 636637 (9th Cir. Mar. 4, 2022)................................................25

*United States v. Kaplan*,
    836 F.3d 1199 (9th Cir. 2016) .........................................................................................8

*Walker v. B&G Foods, Inc.*,
   No. 15-3772, 2016 WL 463253 (N.D. Cal. Feb. 8, 2016) ...................................................8

*Weiss v. Trader Joe's Co.*,
   838 F. App'x 302 (9th Cir. 2021) ...........................................................................22, 23, 24

**Statutes**

21 U.S.C. § 342 ............................................................................................................... *passim*

21 U.S.C. § 348 ............................................................................................................... *passim*

21 U.S.C. § 393 .........................................................................................................................8

**Other Authorities**

21 C.F.R § 105.3 ............................................................................................................. *passim*

21 C.F.R. § 172.831 ............................................................................................................4, 9

FDA, *Food Additives Permitted for Direct Addition to Food for Human Consumption; Sucralose*,
   63 Fed. Reg. 16417 (Apr. 3, 1998) ............................................................................ *passim*

FDA, *Food Labeling: Revision of the Nutrition & Supplement Facts Labels*,
   81 Fed. Reg. 33742 (May 27, 2016) ..............................................................................5, 10

## INTRODUCTION AND STATEMENT OF ISSUES

This consumer class action concerns Splenda, a low-calorie sweetener that millions of Americans use as a substitute for sugar. The FDA determined decades ago that sucralose, the sweetening agent in Splenda, is safe for consumption and has no adverse effect on the body's ability to regulate blood glucose levels. The FDA reached this conclusion after an exhaustive, decade-long review of the scientific literature—including over 100 studies and multiple clinical trials intended to assess whether sucralose poses health risks to consumers with diabetes. Based on that review, the FDA found that "sucralose has no adverse health effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetic patients." FDA, *Food Additives Permitted for Direct Addition to Food for Human Consumption; Sucralose*, 63 Fed. Reg. 16417, 16430 (Apr. 3, 1998). The FDA then approved sucralose as a general-purpose sweetener—which, under the federal Food, Drug, & Cosmetic Act ("FDCA"), reflects the FDA's reasoned judgment that sucralose is "not injurious" to human health. 21 U.S.C. §§ 342(a)(1), 348(a).

Plaintiff—a serial class action litigant who has filed at least seven other product mislabeling lawsuits in this District—believes that he knows better than the FDA.[1] Relying on a cherry-picked assortment of studies, Plaintiff alleges that "sucralose has been shown to cause and worsen diabetes, among other harms." Compl. ¶ 1. He therefore alleges that it is misleading for TC Heartland to label its Splenda-branded products (the "Products") as "suitable for people with diabetes," to state that they "help[] manage blood sugar," to highlight that Splenda is the "#1 recommended brand by doctors and dietitians," or to sell Splenda-sweetened "Diabetes Care" shakes. And while Plaintiff has framed this lawsuit as a false advertising case, it ultimately seeks to second-guess the FDA's repeated, consistent finding that sucralose is safe for consumption and that its presence does not render food "injurious to health."

That finding is fatal to Plaintiff's lawsuit in multiple ways. It renders Plaintiff's lawsuit—which attempts to use California's consumer protection statutes to challenge the FDA's finding that sucralose is safe and not "injurious to health"—preempted. It also forecloses any plausible allegation that sucralose

---

[1] *See Prescott v. Abbott Labs.*, No. 23-4348; *Prescott v. Ricola USA, Inc.*, No. 23-2983; *Prescott v. Mars, Inc.*, No. 23-1352; *Prescott v. Rite Aid Corp.*, No. 22-5798; *Prescott v. Bayer HealthCare Pharm., Inc.*, No. 20-102; *Prescott v. Rite Aid Corp.*, No. 22-5798; *Prescott v. Nestle USA, Inc.*, No. 19-7471. Although these cases concern a diverse array of products (such as dark chocolate, cough drops, and detergent), they are all false advertising class actions that assert claims under California's consumer protection statutes.

is unsafe or that the labeling claims at issue are deceptive.  And while Plaintiff tries to claim that he suffered an *economic* injury due to the use of the challenged labeling claims, those claims fail—both because Plaintiff cannot establish a cognizable injury-in-fact and because no reasonable consumer would interpret the labeling in the way Plaintiff alleges.  This Court should dismiss this lawsuit for three reasons:

First, Plaintiff's lawsuit is preempted because it seeks to second-guess the FDA's determination that sucralose is safe for human consumption and suitable for consumers with diabetes.  The FDCA charges the FDA, rather than private plaintiffs, with regulating the safety of the food supply and determining whether food is safe for human consumption.  To that end, when the FDA approves the use of a food additive, the FDCA makes clear that a food cannot be deemed "adulterated" (*i.e.*, "injurious to health") because it contains the approved food additive.  *See* 21 U.S.C. §§ 342(a)(1), 348(a)(3).  Here, Plaintiff does not (and cannot) dispute that the FDA has deemed sucralose safe for consumers with and without diabetes based on an exhaustive review of the scientific evidence.  It does not matter whether Plaintiff agrees with the FDA's assessment of the literature.  Nor does it matter that Plaintiff has framed this case as a false advertising lawsuit.  What matters is that Plaintiff's lawsuit relies on the premise that sucralose is "injurious to health" for people with diabetes—a premise that the FDA has squarely rejected.

Second, the FDA's finding that sucralose is safe for human consumption also renders Plaintiff's claims implausible.  When the FDA has determined that a substance is safe, courts routinely dismiss false advertising lawsuits premised on the theory that the challenged substance is unsafe.  Here too, the FDA has determined that sucralose is safe, that it is not "injurious to health," and that it serves a "special dietary use" in managing diabetes and controlling calorie intake.  Because Plaintiff's claims all rely on the premise that sucralose is *unsafe*, the FDA's contrary finding precludes Plaintiff from stating a plausible claim.

Plaintiff attempts to avoid this result by citing a laundry list of articles that purportedly prove that "sucralose has been shown to induce and worsen obesity, metabolic syndrome, and Type 2 diabetes itself by interfering with bodily responses that contribute to control glucose and energy balance."  Compl. ¶ 24.  But those articles do not support Plaintiff's sweeping, hyperbolic allegations about the supposed dangers of sucralose.  To the contrary, several of the studies Plaintiff cites concede that there is no "proof" that

sucralose or other low-calorie sweeteners "cause metabolic disorders in human subjects."[2]  Ex. 1, at 8. As one of those studies notes, the "effects of sucralose consumption on the gut microbiota are still a matter of debate." Ex. 2, at 11.  The authors of these studies expressly caution against drawing broad conclusions from them—which is exactly what Plaintiff has done here.

In any event, the limitations of these studies are apparent on their face.  Most do not test Splenda-branded products (let alone in the quantities consumers typically use), and some do not even test sucralose. Many are animal studies whose findings cannot be extrapolated to humans.  Most importantly, none of those studies establish that Splenda-branded products—which contain a proprietary blend of sucralose, dextrose, and maltodextrin—cause any of the health problems Plaintiff alleges.  At most, some of the studies Plaintiff cites suggest a potential *correlation* between sucralose consumption and health harms. But that is not sufficient to second-guess the FDA's determination that sucralose is safe to consume.

<u>Third</u>, to the extent Plaintiff alleges that TC Heartland's use of the challenged labeling claims caused him to suffer an *economic* injury, those claims fail as well.  Absent any plausible allegation that Splenda is unsafe or caused him physical harm, Plaintiff cannot establish that he suffered any economic injury either—which means he lacks Article III standing.  Plaintiff's effort to frame this case as a garden-variety product mislabeling case also fails because none of the claims he challenges—such as "suitable for people with diabetes" or #1 recommended brand by doctors and dietitians"—are likely to mislead reasonable consumers.  Viewed in context, all those labeling claims convey is that Splenda-branded products are suitable for people with diabetes *because* they do not contain sugar.  Absent any plausible claim of deception, Plaintiff's claims of economic injury cannot survive dismissal.

## **BACKGROUND**

### I.    **After Evaluating More Than 100 Studies and Clinical Trials, the FDA Approved Sucralose as Safe for Human Consumption—And Recently Reaffirmed That Sucralose Remains Safe.**

Splenda is a brand of low-calorie sweeteners.  It refers not only to the eponymous sweetener—which comes in yellow packets found in millions of homes, coffee shops, and restaurants—but also to a

---

[2]  All exhibits are attached to the concurrently filed Declaration of Alexander M. Smith and are either subject to judicial notice or are incorporated by reference in the Complaint.  An appendix of studies Plaintiff cites in his complaint (and which TC Heartland includes as exhibits) is attached to this brief.

variety of products that TC Heartland sells under the Splenda brand.  Those products include syrups, liquid water enhancers, sweet teas, and Splenda Diabetes Care shakes.  *See* Compl. ¶ 8 (list of products at issue).

The primary sweetening agent found in Splenda-branded products, sucralose, is a substitute for sugar that is "used to sweeten and in some cases enhance the flavor of foods."  Ex. 3; *see also* 21 C.F.R. § 172.831(c) (authorizing the use of sucralose "as a sweetener in foods generally").  As the FDA has recognized, "[p]eople may choose to use sweeteners instead of sugar for various reasons."  Ex. 3.  In contrast to sugar, which contains four calories per gram, "sweeteners contribute only a few or no calories to the diet."  *Id.*  And unlike sugar, which can raise blood glucose levels in consumers with diabetes, sweeteners like sucralose "generally will not raise blood sugar."  *Id.*  Indeed, the FDA has expressly stated that sweeteners like sucralose can be "use[d] for regulation of the intake of calories and available carbohydrate, or for use in the diets of diabetics."  21 C.F.R. § 105.3(a)(2).

As part of its duty to regulate the safety of the food supply, the "FDA assesses the safety of a sweetener by evaluating the available safety information about the sweetener to identify potential hazards and determine a safe level of exposure."  Ex. 3.  After McNeil Specialty Products (the original manufacturer of Splenda) petitioned the FDA to approve sucralose in 1987, the FDA did just that.  It reviewed "more than 110 studies designed to identify possible toxic effects," as well as "human clinical trials to address metabolism and effects on patients with diabetes."  *Id.*  After conducting this extensive review, the FDA found in 1998 that "sucralose has no adverse health effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetic patients."  63 Fed. Reg. at 16430.

As the FDA explained, the studies it reviewed showed that sucralose "has no influence on insulin secretion by rats or humans," "has no effect on postprandial or fasting blood glucose levels in animals or humans," and "causes no changes in intestinal absorption of glucose or fructose."  *Id.*  The FDA also observed that "sucralose has no effect on glucose utilization or on any of the key enzymes modulating glucose metabolism or storage" and that "administration of sucralose results in no clinical or pathological symptoms similar to those observed in diabetes mellitus."  *Id.*  In other words, the FDA emphasized that it had "no safety concerns regarding the use of sucralose by diabetic individuals."  *Id.*

The FDA then "established an acceptable daily intake (ADI) level," which "is the amount of [sucralose] considered safe to consume each day over a person's lifetime."  Ex. 3.  The ADI for sucralose

is 5 mg per kilogram of body weight per day, which is equivalent to 23 packets of Splenda per day for a person who weighs 60 kilograms (or 132 pounds). *Id.* In other words, the FDA determined that sucralose "does not pose safety concerns if the estimated daily intake is less than" the ADI—which, for many adults, equates to more than two dozen packets of Splenda *each day*. *Id.* And because "sucralose is about 600 times sweeter than sugar" (*id.*), the FDA has recognized that consumers "don't need to use much" sucralose to sweeten their coffee, tea, or food. Ex. 4.

The FDA's approval of sucralose as an all-purpose food additive means, as a matter of law, that its presence does not render a food "adulterated." The FDCA provides that a food is "adulterated" if, among other things, it is "injurious to health." 21 U.S.C. § 342(a)(1). A food is *not* "adulterated"—*i.e.*, is not "injurious to health"—simply because it contains an FDA-approved food additive. *See* 21 U.S.C. § 348(a) ("[A] food shall not, by reason of bearing or containing . . . a food additive in accordance with the regulation or notification, be considered adulterated under section 342(a)(1) . . . ."). In other words, the FDA's approval of sucralose reflects its determination that sucralose, when used consistent with its approved conditions of use, cannot be considered "injurious to health" or unsafe.

Although the FDA approved sucralose for use as an all-purpose sweetener over 25 years ago, it "continues to monitor the latest science available on sweeteners in a variety of ways." Ex. 3. Among other things, it "stay[s] abreast of published literature and the current level of consumer exposure," "participate[s] in international scientific and standard-setting activities related to food ingredient safety," and regularly "reassess[es] the science about the exposure and safety of . . . sweetener[s]." *Id.* To that end, when the FDA updated its regulations in 2016 to require a declaration of added sugars in the Nutrition Facts panel, it once again rejected several comments suggesting that "low-calorie sweeteners may be harmful to health." FDA, *Food Labeling: Revision of the Nutrition & Supplement Facts Labels*, 81 Fed. Reg. 33742, 33819 (May 27, 2016). Instead, the FDA reiterated that "there is no convincing evidence of a cause and effect relationship between these sweeteners and negative health effects in humans." *Id.*

## II. Allegations of the Complaint.

Despite the FDA's repeated findings that sucralose is safe for human consumption and that it is not "injurious to health," Plaintiff alleges that, "according to science yet unknown to consumers, sucralose negatively affects pancreatic beta cells" and thereby "promote[s] insulin resistance, destabilizes glucose

absorption, causes obesity, and harms the gut microbiome."  Compl. ¶ 4; *see also id.* ¶ 24 ("[S]ucralose has been shown to induce and worsen obesity, metabolic syndrome, and Type 2 diabetes itself by interfering with bodily responses that contribute to control glucose and energy balance.").  Although Plaintiff acknowledges that the FDA has "approved sucralose as a general-purpose sweetener" (*id.* ¶ 39), he nonetheless alleges—based on a hodgepodge of studies and "meta-analyses," as well as public statements from the World Health Organization ("WHO")[3] and the Center for Science in the Public Interest ("CSPI")—that sucralose is unsafe for consumption.[4]  *See id.* ¶¶ 24–38.

Based on this allegation, Plaintiff alleges that it is misleading for TC Heartland to label the Products with the phrases "Diabetes Care," "suitable for people with diabetes," "helps manage blood sugar," "#1 recommended brand by doctors and dieticians," and "#1 sweetener brand recommended by doctors and dieticians."  *See id.* ¶¶ 7–8.  Plaintiff asserts that these representations suggest that "the Products would be suitable for and aid in managing . . . diabetes."  *Id.* ¶ 14(c).  But because the Products contain sucralose, Plaintiff alleges that they are "neither healthy nor suitable" for the "management of blood sugar generally and diabetes specifically."  *Id.* ¶ 4.

Critically, Plaintiff does not allege that he (or any other consumer) suffered any physical injury or developed any health condition from consuming the Products.  Nor does he allege that the Products made it more difficult for him manage his blood sugar.  Instead, he alleges an *economic* injury—*i.e.*, that he "would not have purchased the Products, or would not have paid as much for them, had he known they could not provide the advertised benefits."  *Id.* ¶¶ 14(d), 55.  Based on this theory, Plaintiff asserts

---

[3] Although Plaintiff alleges that the WHO has advised consumers not to use sucralose to minimize the risk of diabetes or to reduce calorie consumption (*see* Compl. ¶ 37), the WHO expressly noted that this recommendation did not apply to "individuals with pre-existing diabetes." Ex. 5, at 2.  The WHO also made clear that its recommendation to avoid low-calorie sweeteners was a "conditional" recommendation, as "the link observed in the evidence between NSS and disease outcomes might be confounded by baseline characteristics of study participants and complicated patterns of NSS use."  *Id.*

[4] Plaintiff also alleges that "a six-month clinical test on sucralose conducted during the first round of FDA-approval found sucralose to have a *negative* effect on blood sugar."  Compl. ¶ 39 (emphasis in original).  But as the FDA noted, McNeil Specialty Products—which owned the Splenda brand prior to its sale to TC Heartland—responded to the findings of this study by "initiat[ing] additional studies with the main objective of evaluating the effects sucralose would have on glucose homeostasis in patients with diabetes mellitus."  63 Fed. Reg. at 16418.  After reviewing these "additional studies," the FDA concluded—in no uncertain terms—that "sucralose has no adverse health effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetic patients."  *Id.* at 16430.

California-law consumer fraud claims on behalf of a putative California class and claims for breach of express warranty and unjust enrichment on behalf of a putative nationwide class.  *See id.* ¶¶ 58, 71–142.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Facts indicating the "mere *possibility* of misconduct" do not suffice.   *Id.* at 679.   "[C]onclusory allegations" and "unwarranted inferences" are also "insufficient to avoid dismissal."  *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (*Kwan II*).   Rather, Plaintiff must plead sufficient "factual content to nudg[e] his claim . . . across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 683.

Here, Plaintiff's claims all hinge on his allegation that sucralose "has been shown to cause and worsen diabetes, among other harms."  Compl. ¶ 24.  But because the FDA has approved sucralose as a food additive, the FDCA makes clear that the Products cannot be deemed "injurious to health" simply because they contain sucralose.  21 U.S.C. §§ 342(a)(1), 348(a).  That finding not only renders Plaintiff's claims preempted, but also undermines the core factual allegation on which his entire lawsuit hinges.  And as explained below, the studies and articles Plaintiff cites do not change this result.  Even if this Court were inclined to re-weigh the evidence the FDA already considered, the materials Plaintiff cites do not support the broad claims for which Plaintiff cites them—even if one takes them at face value.

Plaintiff's efforts to evade dismissal based on allegations of "economic" injury also fail.  Absent any plausible allegation that sucralose is unsafe, Plaintiff cannot establish either a physical or an economic injury—which means he lacks Article III standing.  And even if Plaintiff *had* standing, his claims of economic injury fail on their merits because the labeling is not likely to mislead reasonable consumers.

## I.     The FDA's Determination That Sucralose Is Safe for Consumers With and Without Diabetes Preempts Plaintiff's Claims, Which Seek to Second-Guess That Determination.

Conflict preemption occurs when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 399 (2012); *see Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) (finding that a state-law design defect claim was preempted because it conflicted with the minimum airbag standard imposed by the Department of Transportation).  Federal regulatory action "need not specify its preemptive force in order . . . to have

such force." *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022).  Rather, "[u]nder the doctrine of implied conflict preemption, the statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *Id.*  As one court put it:

> When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives.  Allowing state law to impose a different standard permits a re-balancing of those considerations.  A state-law standard that is more protective of one objective may result in a standard that is less protective of others.

*Id.* at 1029 (citation omitted).  Viewed through this lens, Plaintiff's claims are preempted—not only because they conflict with the FDA's determination that sucralose is safe, but also because they seek to use state law to usurp the FDA's authority to decide whether a substance is safe or "injurious to health."

Here, there can be no dispute that federal law charges the FDA with regulating the safety of the food supply.  The FDCA "subjects the food industry to comprehensive regulation" by the FDA, which Congress has empowered to regulate food safety.  *Walker v. B&G Foods, Inc.*, No. 15-3772, 2016 WL 463253, at *5 (N.D. Cal. Feb. 8, 2016); *see also United States v. Kaplan*, 836 F.3d 1199, 1208 (9th Cir. 2016) ("The FDCA's overall purpose is to protect consumers from dangerous products.").  To that end, the FDA aims to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner" and ensures that "foods are safe, wholesome, sanitary, and properly labeled."  21 U.S.C. § 393(b)(1), (2)(A).

As part of its role in regulating the safety of the food supply, the FDA employs its scientific and technical expertise to review scientific studies and other evidence regarding foods and food additives to determine whether they are safe for human consumption.  *See Walker*, 2016 WL 463253, at *6; *cf. Gordon v. Church & Dwight Co.*, No. 09-5585, 2010 WL 1341184, at *2 (N.D. Cal. Apr. 2, 2010) (noting that the FDA's "regulatory role" involves "interpret[ing] scientific studies or other evidence" to determine whether FDA-regulated products are safe).  As one court noted, "[d]etermining whether . . . products [are] at risk of containing *harmful* levels of [a particular component] is a technical and policy consideration within the FDA's field of expertise."  *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, No. 21-269, 2022 WL 10197651, at *13 (E.D. Va. Oct. 17, 2022) (emphasis in original).

1   Critically, once the FDA decides that a food additive is safe for consumption, that determination

2   carries the force of law.  As explained above, the FDCA provides that a food is "adulterated" if it is

3   "injurious to health." 21 U.S.C. § 342(a)(1).  It also provides that a food is not "adulterated"—or is not

4   "injurious to health"—simply because it contains an FDA-approved food additive.  *See* 21 U.S.C. § 348(a)

5   ("[A] food shall not, by reason of bearing or containing . . . a food additive in accordance with the

6   regulation or notification, be considered adulterated under section 342(a)(1) . . . .").  In other words, the

7   FDCA expressly contemplates that the FDA, by approving a food additive, has determined that it cannot

8   be considered "injurious to health" when used consistent with its approved conditions of use.

9   Nor can there be any dispute that the FDA drew upon its experience in evaluating sucralose and

10   making a "reasoned judgment" about its safety.  *Cohen*, 46 F.4th at 1029.  Between 1987 and 1998, the

11   FDA conducted an exhaustive review of the scientific literature and requested additional data regarding

12   the effects of sucralose in consumers with diabetes.  *See* 63 Fed. Reg. at 16430.  After doing so, the FDA

13   concluded that sucralose is safe for human consumption and that it could be "used as a sweetener in food

14   generally." 21 C.F.R. § 172.831(c).  It specifically determined that "sucralose has no adverse health

15   effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetes patients."

16   63 Fed. Reg. at 16430.  As the FDA explained, the scientific literature showed that:

> (1) Sucralose has no influence on insulin secretion by rats or humans; (2) sucralose has no
> effect on postprandial or fasting blood glucose levels in animals or humans; (3) sucralose
> causes no changes in intestinal absorption of glucose or fructose; (4) sucralose has no effect
> on glucose utilization or on any of the key enzymes modulating glucose metabolism or
> storage; (5) administration of sucralose results in no clinical or pathological symptoms
> similar to those observed in diabetes mellitus; and (6) because sucralose has no influence
> on insulin's action on blood glucose levels, it would not be anticipated to result in
> difficulties with insulin-based management of diabetes.

22   *Id.*  Based on "the data in the clinical studies and other available information in the sucralose database,"

23   the FDA found that it had "no safety concerns regarding the use of sucralose by diabetic individuals."  *Id.*

24   Moreover, the FDA regulations themselves make clear that sucralose is suitable for consumers

25   with diabetes.  For example, the FDA characterizes foods made with artificial sweeteners as "special

26   dietary" foods suitable "for regulation of the intake of calories and available carbohydrate, or for use in

27   the diets of diabetics." 21 C.F.R. § 105.3(a)(2); *see also Coca-Cola Bottling Co. v. Coca-Cola Co.*, 563

28   F. Supp. 1122, 1134 n.45 (D. Del. 1983) (noting that "[d]rinks with artificial sweeteners" are considered

1    "special dietary foods" under 21 C.F.R. § 105.3(a)(2)).  In other words, the FDA has expressly rejected

2    Plaintiff's claim that sucralose-based sweeteners like Splenda are not "suitable for people with diabetes."

3            Federal law therefore preempts this lawsuit—which not only seeks to impose liability on TC

4    Heartland for selling a sweetener the FDA has approved, but also to enjoin it from further "manufacture,

5    marketing, and sale of the Products."  Compl. ¶ 10.  Indeed, the FDCA explicitly provides that a product

6    containing an approved food additive (such as sucralose) "shall not be . . . considered adulterated" until a

7    regulation approving that food additive "is revoked," and it charges the FDA with determining when and

8    how to revoke the approval of a food additive.  21 U.S.C. §§ 348(a)(1), 348(i).  Because the FDCA entrusts

9    the role of deciding when a food additive is "injurious to health" to the FDA alone, Plaintiff cannot use

10   state law to hold TC Heartland liable for labeling the Products consistent with the FDA's findings

11   regarding sucralose—let alone to enjoin TC Heartland from selling those products.

12           Even if Plaintiff does not specifically claim that sucralose is "adulterated," his lawsuit nonetheless

13   hinges on the allegation that sucralose is unsafe—*i.e.*, "injurious to health."  *See* Compl. ¶ 1 (alleging that

14   TC Heartland engages in "consumer fraud" by marketing the Products as a "healthy sugar alternative"

15   even though they contain sucralose, which "has been shown to cause and worsen diabetes").  That is a

16   premise the FDA has rejected.  Moreover, to the extent this lawsuit seeks to hold TC Heartland liable for

17   labeling the Products as "suitable for people with diabetes" or highlighting their utility in managing blood

18   glucose, that would conflict with the FDA's determination that sucralose serves a "special dietary use[]"

19   in the management of diabetes and calorie intake.  21 C.F.R § 105.3(a).  Imposing liability under state law

20   for using a sweetener that the FDA has expressly approved and for using labeling consistent with an FDA-

21   approved "special dietary use" would undermine the careful regulatory scheme Congress set forth in the

22   FDCA—which means that this lawsuit is preempted.  *See Cohen*, 46 F.4th at 1028–29.

23           Just as importantly, imposing liability on TC Heartland for its marketing and sale of the Products

24   would also undermine the FDA's expressed goal of reducing added sugar consumption by the general

25   population.  *See* 81 Fed. Reg. at 33804 ("Added sugars consumption among the general U.S. population

26   exceeds what can reasonably be consumed within calorie limits and can have a negative impact on

27   health.").  Indeed, the FDA has specifically recognized that artificial sweeteners have a "special dietary

28   use" in the management of calorie intake because they serve as a replacement for added sugar, which is

one of the leading contributors of excess calories to the diet.  21 C.F.R. § 105.3(a).  There can be no dispute that this lawsuit, which seeks to prohibit the sale of "the most recognizable and iconic low-calorie sweetener brand in the world" to millions of people who "seek out food products that are sugar-free [and] low in calories" (Compl. ¶¶ 10, 17-18), poses a significant "obstacle to the full accomplishment" of the FDA's goal of reducing sugar intake.  *Cohen*, 46 F.4th at 1029.  That, too, renders this lawsuit preempted.

## II.    The FDA's Determination That Sucralose Is Safe Renders Plaintiff's Claims Implausible.

### A.    The FDA's finding that sucralose is safe for consumption and serves a "special dietary use" in the management of diabetes defeats the factual premise of Plaintiff's claims.

The FDA's determination that sucralose is safe for human consumption and serves a "special dietary use" in the management of diabetes and calorie intake does not just preempt Plaintiff's claims.  It also renders those claims—which all hinge on his allegation that sucralose is *not* safe for human consumption or suitable for people with diabetes—implausible.  Indeed, courts have routinely rejected similar efforts to second-guess the FDA's judgment that substances in consumer products—such as sucralose—are safe for consumers.

*Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190 (N.D.N.Y. 2016), is directly on point.  There, the court preliminarily enjoined Chobani from suggesting that Dannon Light & Fit yogurt was "unsafe to consume" because it contains sucralose.  *Id.* at 203.  In reaching this conclusion, the court noted that sucralose "has been approved . . . for human consumption since 1999," that it "has been extensively studied," and that "the FDA has reviewed more than 110 safety studies in connection with its use as a general purpose sweetener for food."  *Id.* at 197.  In light of that background, the court rejected the proposition that "the question of sucralose's safety is still the subject of legitimate scientific debate," and instead found that "the balance of record evidence reflects that sucralose is an unusually well-studied compound repeatedly determined to be safe for ordinary consumption."  *Id.* at 203.

Similarly, in *Herrington v. Johnson & Johnson Consumer Cos.*, Judge Wilken dismissed a lawsuit alleging that the defendants failed to warn consumers that their children's bath products contained 1,4-dioxane, which the plaintiffs described as a "probable human carcinogen[]" to which "scientists believe there is no safe level of exposure."  No. 09-1597, 2010 WL 3448531, at *3 (N.D. Cal. Sept. 1, 2010).  In so holding, Judge Wilken noted that the FDA "stated that the levels of 1,4-dioxane . . . seen in [its]

1   monitoring of cosmetics do not present a hazard to consumers." *Id.* at *3 n.2.  Given that finding, Judge

2   Wilken agreed that the plaintiffs did not plausibly "plead that the amounts of the substances in Defendants'

3   products have caused harm or create a credible or substantial risk of harm"—as would be necessary to

4   establish that the defendants had a duty to disclose that purported risk to consumers. *Id.* at *3.

5        Most recently, a California federal court dismissed a lawsuit alleging that the defendant's

6   sunscreen was "not safe" because it contained benzene, which the plaintiff alleged to be a "known

7   carcinogen even at low levels of exposure" based on "citations to published literature and statements from

8   the scientific community." *Bowen v. Energizer Holdings, Inc.*, No. 21-4356, 2023 WL 1786731, at *1, 6

9   (C.D. Cal. Jan. 5, 2023).  In dismissing the lawsuit, the court noted that the amount of benzene allegedly

10  present in the sunscreen (0.29 parts per million) was "less than the FDA's 2 ppm benzene limit." *Id.* at

11  *2.  Because the plaintiff did "not allege benzene amounts higher than the FDA requirements," the court

12  found that her allegations of a safety hazard were "entirely speculative and hypothetical." *Id.*

13       These cases—and others—illustrate that a plaintiff cannot plausibly allege that a substance is

14  hazardous or unsafe to consume when the FDA has concluded that the substance "is not dangerous."

15  *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010); *see also Kimca v. Sprout Foods,*

16  *Inc.*, No. 21-12977, 2022 WL 1213488, at *7 (D.N.J. Apr. 25, 2022) (dismissing lawsuit premised on

17  alleged failure to disclose heavy metals in baby food and noting that the FDA's statement that "children

18  are not at an immediate health risk from exposure to toxic elements in foods" "weakens the inference that

19  the amount of heavy metals in the Baby Food Products creates a substantial risk of danger to children").

20  The same is true here.  In contrast to Plaintiff's insistence that sucralose is "neither healthy nor suitable

21  for" "the management of blood sugar generally and diabetes specifically" (Compl. ¶ 4), the FDA has found

22  that sucralose is safe for consumption and that it "has no adverse health effects on short-term or long-term

23  glucose homeostasis or any other adverse effect in diabetes patients." 63 Fed. Reg. at 16430.  Put simply,

24  "sucralose is an unusually well-studied compound repeatedly determined to be safe for ordinary

25  consumption," and its safety is not a "subject of legitimate scientific debate." *Chobani*, 157 F. Supp. 3d

26  at 203.  Plaintiff's allegations to the contrary are implausible and cannot support a viable claim.

27

28

**B.     The studies Plaintiff cites do not support his claim that sucralose is unsafe.**

Faced with the FDA's consistent determination that sucralose is safe and suitable for use by people with diabetes, Plaintiff tries to render his claims plausible by citing dozens of articles.  According to Plaintiff, these articles substantiate his allegation that "sucralose has been shown to induce and worsen obesity, metabolic syndrome, and Type 2 diabetes itself by interfering with bodily responses that contribute to glucose control and energy balance."  Compl. ¶ 24; *see also id.* ¶¶ 25–38 (compiling studies). But as explained above, it is not this Court's role to re-weigh the evidence the FDA has already considered or to second-guess its determination that sucralose is safe.  *See Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 934 (N.D. Cal. 2015) ("Whether a body of evidence sufficiently demonstrates that a particular amount of a chemical substance poses a serious public health risk is precisely the kind of expert question that agencies are better suited to answer than courts or juries.").  Indeed, given the FDA's central role in regulating food labeling and the safety of the food supply, it cannot be the law that a plaintiff can sue a manufacturer for selling a product that the FDA has deemed safe and "not injurious"—or for labeling that product consistent with an FDA-approved "special dietary use"—simply because he can cobble together a few scientific studies that allegedly support his position.

But even if that *were* the law, Plaintiff's claims would still fail because his cited studies do not support the sweeping claims for which he cites them.  *See Alamilla v. Hain Celestial Grp., Inc.*, 30 F. Supp. 3d 943, 944 (N.D. Cal. 2014) (dismissing lawsuit based on scientific articles and noting that a court "need not accept as true" a plaintiff's characterization of scientific studies if the studies themselves do not support the plaintiff's allegations).  Even a cursory review of those studies makes clear that that they do not support Plaintiff's allegations about the purported dangers of sucralose—let alone permit him to second-guess the FDA's consistent, evidence-based determination that sucralose is safe.

As many courts have recognized, a plaintiff cannot rely on studies or articles to challenge a defendant's labeling when those studies do not actually "disprove Defendant's claims."  *Kwan v. SanMedica Int'l, LLC*, No. 14-3287, 2015 WL 848868, at *6 (N.D. Cal. Feb. 25, 2015) (*Kwan I*), *aff'd*, 854 F.3d 1088 (9th Cir. 2017).  For that reason, this Court can—and should—probe beyond Plaintiff's characterization of the sources he cites to determine whether those sources actually "show a causal link" between the Products and the purported health harms he attributes to sucralose.  *Geffner v. Coca-Cola*

*Co.*, 343 F. Supp. 3d 246, 253 (S.D.N.Y. 2018) (*Geffner I*), *aff'd*, 928 F.3d 198 (2d Cir. 2019) (*Geffner II*); *see also Alamilla*, 30 F. Supp. 3d at 944 (dismissing false advertising lawsuit where the "articles the plaintiffs cite . . . contradict the allegation upon which their entire complaint hinges").

For example, several courts have dismissed lawsuits alleging that the use of the term "diet" to describe zero-calorie sodas was misleading based on studies purportedly showing that aspartame causes weight gain. The Second Circuit affirmed the dismissal of a "diet soda" lawsuit because "[n]one of the studies cited in the Complaint . . . establish a causal relationship between aspartame and weight gain." *Excevarria v. Dr. Pepper Snapple Grp., Inc.*, 764 F. App'x 108, 110 (2d Cir. 2019); *see also, e.g.*, *Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 109 (2d Cir. 2019) (*Manuel II*) (same). Multiple judges in this District have reached the same conclusion. *See, e.g.*, *Becerra v. Coca-Cola Co.*, No. 17-5916, 2018 WL 1070823, at *4 (N.D. Cal. Feb. 27, 2018) (dismissing "diet soda" lawsuit where the plaintiff's cited studies "all acknowledge that the question of *causation*, rather than *correlation*, remains undetermined") (emphasis in original); *Becerra v. Dr. Pepper/Seven-Up, Inc.*, No. 17-5921, 2018 WL 1569697, at *6 (N.D. Cal. Mar. 30, 2018) (*Dr. Pepper I*), *aff'd*, 945 F.3d 1225 (9th Cir. 2019) (*Dr. Pepper II*) (dismissing "diet soda" lawsuit where the plaintiff's cited studies "support merely a correlation or relationship between artificial sweeteners and weight gain, or risk of weight gain").

Other courts have likewise dismissed complaints where there is a "mismatch between the representations at issue and the evidence that allegedly debunks them." *Eckler v. Wal-Mart Stores, Inc.*, No. 12-727, 2012 WL 5382218, at *3, 7 (S.D. Cal. Nov. 1, 2012) (dismissing lawsuit alleging that the labeling of glucosamine supplements falsely represented it was "formulated to help support joint comfort and rebuild cartilage and lubricate joints" in light of studies purporting to show that glucosamine "doesn't alleviate the symptoms of osteoarthritis in the hip and knee"); *see also, e.g.*, *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 137 (E.D.N.Y. 2015) (dismissing lawsuit challenging the labeling of Centrum vitamins where "there is a fundamental mismatch between [the] studies and the Centrum statements that plaintiffs attack"). As the *Eckler* court explained, a court can—and should—consider at the pleading stage what the plaintiff's cited studies do (and do not) say. If "the studies . . . wouldn't show what [the plaintiff] claims they do," a court is "left with no facts from which to infer that [the defendant] is liable for false advertising." *Eckler*, 2012 WL 5382218, at *6; *see also, e.g.*, *Amado v. Procter & Gamble Co.*, No. 22-

5427, 2023 WL 3898984, at *7–8 (N.D. Cal. June 8, 2023) (dismissing lawsuit alleging that "appetite control," "blood sugar," and "digestive health" representations on Metamucil were misleading and noting that "the studies on which plaintiffs rely . . . fail to support their allegations").

Here, Plaintiff cites dozens of studies and meta-analyses that purport to establish that sucralose is unsafe. *See* Compl. ¶¶ 24–38. But none of those studies establish that sucralose—when consumed in the doses individuals typically consume—is unsafe.[5]  *See Kwan II*, 854 F.3d at 1098 (affirming dismissal of false advertising lawsuit where the plaintiff attacked the scientific substantiation for the defendant's claims, but "failed to allege facts that would support a finding the defendant's marketing claims were actually false").  To be clear, this motion to dismiss does not rely on the many articles that criticize the flawed assumptions and methodologies in Plaintiff's cited studies.  That is for another day.  For present purposes, the key point is that studies Plaintiff cites—even taken on their own terms—do not plausibly establish that sucralose is unhealthy, that the Products are unsuitable for people with diabetes, or that TC Heartland's labeling is false or misleading in any way.  That is so for at least four independent reasons:

### 1.      The studies Plaintiff cites do not establish causation or foreclose reverse causation.

The studies Plaintiff cites concede again and again that there is no "irrefutable proof that NNS [non-nutritive sweeteners] cause metabolic disorders in human subjects." Ex. 1, at 8; *see also* Ex. 2, at 11 ("The effects of sucralose consumption on the human gut microbiota are still a matter of debate.").  As one of Plaintiff's cited sources notes, "some studies found positive associations between NNS consumption and weight gain, metabolic syndrome, and type 2 diabetes . . . although other studies did not." Ex. 1, at 2.  The other studies Plaintiff cites are similarly equivocal. *See* Ex. 6, at 431 (concluding that "data from several epidemiologic studies . . . suggest that frequent consumption of LCSs [low-calorie sweeteners] is associated with . . . risk of developing type 2 diabetes," but noting that "results from clinical

---

[5] Critically, it is not sufficient for Plaintiff to allege that there is insufficient evidence supporting TC Heartland's claims about the Products.  Even if Plaintiff could show that TC Heartland's advertising claims were unsubstantiated, California law "preclude[s] private citizens from bringing actions that allege that the challenged advertising language lack[s] proper scientific substantiation."  *Kwan II*, 854 F.3d at 1095; *see also, e.g.*, *Spector v. Mondelēz Int'l, Inc.*, No. 15-4298, 2017 WL 4283711, at *9 (N.D. Ill. Sept. 27, 2017) (noting that it was "not necessary for the Court to resolve" methodological quibbles about the defendant's scientific testing, as the plaintiff's disagreement with the defendant's methodology "does not directly address the question at issue here of whether the [defendant's labeling] claim is false").

studies that evaluate sucralose's effect . . . have been equivocal"); Ex. 7, at 713 (noting that an "umbrella review" of studies involving artificially sweetened beverages suggested a relationship between their consumption and Type 2 diabetes, but that "none of the associations were supported by strong evidence"); Ex. 8, at 71 (concluding that subjects "who consumed artificial sweetening agents had higher insulin resistance as compared" to those "who had no artificial sweeteners," but emphasizing "further studies are required to conclude a direct correlation . . ."); Ex. 9, at 485 (concluding that "[s]ucralose may have effects on glucose metabolism," but that "[f]urther studies are needed to confirm" and "explore" why); Ex. 10, at 128–29 (opining that study findings "may imply that chronic exposure to sucralose leads firstly to increased insulin secretion, and later to reduction of insulin secretion," but that "[f]urther investigation is needed to investigate the clinical significance of these results"); Ex. 11, at 7 (noting that the "effects of artificial sweeteners on glucose metabolism remain unclear" and that "further experimental studies are needed to clarify the underlying mechanisms").

But even if these studies might suggest a "correlation or relationship" between non-nutritive sweeteners and health harms, that does not mean sucralose consumption *causes* those harms. *Dr. Pepper I*, 2018 WL 1569697, at *6. Why? Because "correlation is not causation, neither for purposes of science nor the law." *Id.*; *see also, e.g.*, *Manuel v. Pepsi-Cola Co.*, No. 17-7955, 2018 WL 2269247, at *10 (S.D.N.Y. May 17, 2018) (*Manuel I*) (dismissing "diet soda" lawsuit where the plaintiff's cited studies "point only to a non-causal association between NNS consumption and weight gain (or related health problems)"); *Manuel II*, 763 F. App'x at 109 (affirming dismissal of *Manuel I* and noting that "[n]one of the studies" cited by the plaintiff "purports to establish a causal relationship . . . that is sufficiently strong"). Indeed, at least one of the studies Plaintiff cites expressly cautions that "causality cannot be established" from the study results. Ex. 11, at 7. Because Plaintiff's cited studies do not establish a causal relationship between sucralose and the health harms he alleges (and in some cases *disclaim* causation), Plaintiff cannot rely on these studies to substantiate his implausible claim that Splenda causes these harms.

Plaintiff's reliance on these sources is particularly specious because they acknowledge the possibility of "reverse causation"—*i.e.*, that "individuals who are likely to develop metabolic disease or are gaining weight choose to consume NNS as a strategy to reduce sugar and caloric intake." Ex. 1, at 2; *see also, e.g.*, Ex. 11, at 1, 3 (explaining that "reverse causality . . . may be particularly sensitive in this

type of study" and that, despite efforts to control for it, the "potential for reverse causality cannot be eliminated"); Ex. 7, at 714 (noting that "studies of this topic may be prone to bias" since "consumers could choose these artificial products because they became ill . . . or experienced recent weight gain, which is known as reverse causation effect in epidemiology").[6]  Because the studies Plaintiff cites do not "rule out other factors" that may explain the purported association between sucralose consumption and the health harms Plaintiff alleges, they cannot "plausibly support 'risk' or 'causation'"—which is fatal to Plaintiff's claims.  *Geffner I*, 343 F. Supp. 3d at 254; *see also Manuel I*, 2018 WL 2269247, at *12 ("Without evidence of causation, plaintiffs cannot establish actual deception.").

   2. Many of Plaintiff's cited studies do not involve the Products—or even sucralose.

  Many of the studies Plaintiff cites concern sweeteners other than sucralose.  *See, e.g.*, Ex. 7, at 714 (noting that the studies the authors reviewed predominantly tested acesulfame potassium and aspartame and that the studies involving sucralose "produced inconsistent findings"); Ex. 1, at 8 ("The finding on the effects of NNS on gut microbiome in human subjects is limited to potential effects of saccharin"). Yet, as one study notes, "LCSs [low calorie sweeteners] are a structurally diverse group of chemicals," so "results from 1 LCS cannot be necessarily generalized to another."  Ex. 6, at 432.

  As many courts have agreed, scientific studies cannot establish that a product is unsafe (or that a defendant's labeling claims are false) if they do not even test the product at issue.  *See, e.g.*, *Spector*, 2017 WL 4283711 at *8 (dismissing false advertising lawsuit where the plaintiff's claims of falsity relied "on a comment in a document about a different product that does not address the issue in the lawsuit"); *Eckler*, 2012 WL 5382218, at *6 (rejecting reliance on studies that did not test the product at issue); *Kwan I*, 2015 WL 848868, at *6 (dismissing complaint because it "cite[d] no study that disproves [the defendant's] claims" and noting that none of the studies the plaintiff cited "studied or tested [the defendant's] formula"). That is especially so here, where Plaintiff's cited studies indicate that test subjects responded differently

---

[6] Other studies hypothesize that "that human individuals feature a personalized response" to non-nutritive sweeteners "possibly stemming from differences in their microbiota composition and function" and that "'personalized nutrition' leading to 'personalized medical outcome' may underlie the variable nutritional effects noted in many multi-factorial diseases."  Ex. 12, at 5; *see also* Ex. 2, at 11 ("[W]e must consider other sources of variation in these results, such as genetic background, diet habits, and lifestyles, which may modify the effects of sucralose on the human intestinal microbiome").

to sucralose than to other non-nutritive sweeteners.  *See, e.g.*, Ex. 11, at 8 (noting that "[r]esults suggest positive associations between total artificial sweeteners and main types (aspartame and acesulfame-K in particular) and higher T2D risk," but that "results for sucralose appeared to be less robust . . . and warrant further investigation").  And even the studies that involved sucralose generally did not involve Splenda-branded products, which contain a proprietary blend of dextrose, maltodextrin, and sucralose.  *See* Compl. ¶ 7 (labels listing Splenda's ingredients).  To the extent Plaintiff's cited studies did not test the Products, they cannot support his claims that the Products are unsafe or that TC Heartland's labeling is deceptive.

3.   <u>Plaintiff's cited studies do not account for the *amount* of sucralose consumers use.</u>

Leaving aside that many of Plaintiff's cited studies do not involve the Products or sucralose, some of those studies involved sucralose (and/or other sweeteners) consumed at levels exceeding normal human consumption.  *See, e.g.*, Ex. 13 (study involving 14 subjects who consumed sucralose and acesulfame potassium capsules equivalent to 1.5 liters of diet soda per day).  But because these studies do not account for the amount of sucralose consumers *actually* ingest, they do not support Plaintiff's claim that the Products are unsafe for human consumption.

For example, when the FDA has set an "acceptable daily intake" for a substance, courts routinely reject studies that "fail[] to acknowledge 'acceptable daily intake levels' or consider whether the levels found in the [product] fell within those reported levels."  *Mahler v. Vitamin Shoppe Indus., Inc.*, No. 19-3848, 2023 WL 6141369, at *10 (N.D. Ill. Sept. 20, 2023).   And courts similarly agree that studies involving "extremely high doses" of a chemical cannot be "reliably extrapolated to humans at very low doses."  *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 997 (C.D. Cal. 1996); *see also C.W. v. Textron, Inc.*, No. 10-87, 2014 WL 1047940, at *9 (N.D. Ind. Mar. 17, 2014), *aff'd*, 807 F.3d 827 (7th Cir. 2015) (barring experts from testifying where "the studies upon which they rely do not sufficiently establish that the dose and duration of exposure can cause the injuries complained of in this case"); *Chikovsky v. Ortho Pharm. Corp.*, 832 F. Supp. 341, 346 (S.D. Fla. 1993) (barring expert from testifying about the likelihood that the Vitamin A in the defendant's product, Retin-A, was associated with birth defects where the expert "performed no comparisons between the dose of Vitamin A in the study and that found in Retin-A").  Because Plaintiff's cited studies do not account for the amount of sucralose humans

1  typically consume, they do not establish that the Products—when consumed in normal quantities—cause

2  the health harms Plaintiff attributes to them.

3            4.    Findings from animal studies cannot be extrapolated to humans.

4        Finally, many of the studies Plaintiff cites involve rats, mice, fruit flies, or other non-human

5  subjects.[7]  One of those studies is an in vitro animal study by Susan Schiffman of North Carolina State

6  University, which involved sucralose-6 acetate—an "impurity" created "during the manufacturing

7  process" that was allegedly found in some samples of sucralose produced by another manufacturer.  *See*

8  Ex. 19, at 307.[8]  But as Plaintiff's cited publications recognize, "the relevance of these findings to human

9  subjects is not clear."  Ex. 21, at 2530.  Because of the potential for mismatch, the Ninth Circuit has held

10 that a party relying on animal studies must offer "analytical support for the extrapolation from animals to

11 humans."  *Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002).  Plaintiff fails to do so here.

12       To the contrary, Plaintiff's own studies confirm that data from animal studies cannot be reliably

13 extrapolated, since "data obtained from studies conducted in people often fail to replicate the metabolic

14 outcomes observed in vitro and in animal models."  Ex. 21, at 2530; *see also* Ex. 6, at 431 (noting

15 "discrepancies between findings in animal models and human research").  Unsurprisingly, another court

16 specifically rejected similar animal studies purporting to show that sucralose is unsafe for humans as

17 unreliable.  *See Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, No. 04-10077, 2008 WL 11338092, at *4 (C.D.

18 Cal. July 21, 2008) (holding plaintiff "fail[ed] to provide the requisite analytical support for the

19 extrapolation . . . from rats to humans").  This Court should reach the same conclusion here.

20

21

22 ────────────────

23 [7] This is evident from any of the titles themselves.  *See, e.g.*, Ex. 14 (*Sucralose Induced Pancreatic Toxicity in Albino* **Rats***: Histomorphological Evidence*); Ex. 15 (*Gut Microbiome Response to Sucralose and Its Potential Role in Inducing Liver Inflammation in* **Mice**); Ex. 16 (*Splenda Alters Gut Microflora and Increases Intestinal P-Glycoprotein and Cytochrome P-450 in Male* **Rats**); Ex. 17 (*Sucralose Promotes Colitis-Associated Colorectal Cancer Risk in a* **Murine** *Model*); *see also*, *e.g.*, Ex. 18 (study testing effects of sucralose on fruit flies).

26 [8] After Dr. Schiffman published this paper, she went on a press tour in which she falsely claimed that this study proves that Splenda causes cancer and DNA damage.  Left with no other option to combat her baseless anti-Splenda zealotry, TC Heartland sued Dr. Schiffman for slander, libel, trade libel, and violations of the North Carolina Unfair & Deceptive Trade Practices Act in August 2023.  *See* Ex. 20 (complaint in *TC Heartland LLC v. Schiffman*, No. 23-665 (M.D.N.C.)).

**III.    Plaintiff's Claims of Economic Injury Are Neither Cognizable Nor Plausible.**

Plaintiff will likely argue that because this is a false advertising lawsuit seeking economic damages, he can state a plausible claim—even if he suffered no physical harm due to his use of sucralose—so long as he can allege that the Products' labeling caused consumers to pay a "price premium." *See* Compl. ¶ 5 ("In all cases, consumers are harmed by paying a premium for the health claims touted by Defendant that are untrue."). But absent any plausible allegation of physical harm, Plaintiff's subjective dissatisfaction with the Products' labeling does not amount to a cognizable legal injury, which means he lacks Article III standing. And even if Plaintiff had standing (which he does not), his claims still fail because he has not plausibly alleged that the Products' labeling is likely to deceive reasonable consumers.

**A.    Absent any plausible allegation that sucralose is unsafe, Plaintiff has not suffered any cognizable physical or economic injury and therefore lacks Article III standing.**

To establish Article III standing, Plaintiff must plead "facts demonstrating" that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [TC Heartland], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact," he "must show that he . . . suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Id*. at 339.

Here, while Plaintiff alleges that sucralose is unsafe, he does not allege that the Products caused him physical harm or made it more difficult for him to control his blood sugar. Nor does he allege that the Products failed to serve their essential function as sweet, low-calorie food products. Instead, Plaintiff alleges that the *labeling* of the Products resulted in an *economic* injury because he "would not have purchased the Products, or would not have paid as much for them, had he known they could not provide the advertised benefits." Compl. ¶ 14(d). Plaintiff admits that he "would like to purchase the Products . . . if he could be sure the Products were compliant with California and consumer protection laws"—or, in other words, that the problem is the Products' *labeling*, not the fact that they contain sucralose. *Id.* ¶ 14(e).

But absent any plausible allegation that the sucralose in the Products is harmful or that the Products did not function as intended, Plaintiff's subjective dissatisfaction with the labeling does not amount to a cognizable economic injury. For example, in *Boysen v. Walgreen Co.*, Judge Illston dismissed a lawsuit alleging that Walgreens misrepresented its fruit juices as "safe and healthy despite the presence of lead

and arsenic."   No. 11-6262, 2012 WL 2953069, at *2 (N.D. Cal. July 19, 2012).   In reaching that conclusion, Judge Illston first found that the plaintiff did not plausibly "allege that the levels of lead and arsenic contained in [Walgreens'] juices are likely to cause physical harm."  *Id.* at *7.  Absent any plausible allegation that the juices "may cause physical harm," "violate FDA guidelines for fruit juices," or "function less well than advertised," Judge Illston concluded, the fact that the amounts of heavy metals in the juices "were unsatisfactory to him" was "not sufficient to establish Article III injury in fact."  *Id.*[9]

Similarly, in *Simpson v. California Pizza Kitchen, Inc.*, the plaintiff claimed economic harm from buying pizza that contained trans fatty acids ("TFAs"), the consumption of which allegedly "increases the likelihood of developing certain illnesses and health risks, including cardiovascular disease."  989 F. Supp. 2d 1015, 1019, 1021 (S.D. Cal. 2013).  The court dismissed the case because the plaintiff did not plausibly allege either "a substantial increased risk of harm" from consuming the pizza, or that she "lost money" buying it.  *Id.* at 1022.  Because the presence of TFAs was disclosed on the label and plaintiff consumed the pizza without incident, she could not show "overpayment, loss in value, or loss of usefulness."  *Id.*

That reasoning applies with equal force here.  Plaintiff does not allege that the Products caused him physical harm or made it more difficult to manage his blood sugar.  Nor does he claim that the Products were not sweet or low in calories.  To the contrary, Plaintiff alleges that he repeatedly purchased the Products and wants to buy them again.  *See* Compl. ¶¶ 14(b), 14(e), 15.  His only complaint about the Products is that they contain sucralose, which the label prominently discloses.  The reason for that alleged concern, and the reason he allegedly would have "paid less" for the Products, is his belief that "sucralose

---

[9] More recent "heavy metals" cases have reached the same conclusion.  In *Kimca*, for example, the court dismissed a lawsuit challenging the labeling of baby food that allegedly contained "unsafe levels of heavy metals" and found that the plaintiffs did not allege a legally cognizable economic injury.  2022 WL 1213488, at *1.  Absent a plausible allegation of physical harm or "risk of future harm," the court found that the plaintiffs could not establish that the products were "worth less" than what they paid, that they "did not perform their intended purpose," or that they "were worthless for any other reason."  *Id.* at *9.  And in the *Gerber* case, the court similarly found that the plaintiffs—who allegedly purchased baby food that contained heavy metals—lacked Article III standing.  2022 WL 10197651, at *10.  As in *Boysen* and *Kimca*, the court agreed that the plaintiffs did not plausibly allege a physical injury or risk of physical harm, did not claim that the baby food they bought was "unsafe as to them" or their children, and did not allege that the food "failed to provide [their] children with nourishment or to otherwise perform as intended."  *Id.* at *7–8.  Absent any plausible allegation of physical harm, which the court described as a "necessary predicate to show economic harm," the *Gerber* court found that the plaintiffs' effort to manufacture an economic injury "runs afoul of logic" and dismissed their lawsuit.  *Id.* at *5.

has been shown to induce and worsen obesity, metabolic syndrome, and Type 2 diabetes." *Id.* ¶ 24. But as explained above, Plaintiff does not plausibly allege that the Products caused him to develop any of these health conditions or that they worsened these conditions; to the contrary, Plaintiff admits that he was diagnosed with Type 2 diabetes in 2005, nearly two decades before he brought this lawsuit. *See id.* ¶ 14(b). Because Plaintiff has not plausibly alleged any physical or economic harm arising from his purchase of the Products, his subjective dissatisfaction with the labeling does not amount to a cognizable injury.

### B.     The Products' labeling is not likely to mislead reasonable consumers.

Even assuming *arguendo* that Plaintiff had alleged sufficient facts to "satisfy the requirements for Article III standing," that "does not mean those same facts would be sufficient to state a claim." *Satchell v. Sonic Notify, Inc.*, 234 F. Supp. 3d 996, 1001 (N.D. Cal. 2017). Here too, even if Plaintiff's allegations of economic injury were cognizable, Plaintiff has not alleged that the Products' labeling is deceptive— which is the mechanism through which any alleged economic injury would have taken place.

Plaintiff's lawsuit hinges on his allegation that the challenged labeling claims—such as "suitable for people with diabetes" or ""#1 recommended brand by doctors and dieticians"—mislead consumers into believing that "the Products would be suitable for and aid in managing . . . diabetes." Compl. ¶ 14(c). But leaving aside his failure to allege with plausibility that Splenda (or sucralose) causes the health harms he alleges (*see supra* § II), Plaintiff's lawsuit also fails because no reasonable consumer would interpret the Products' labeling to suggest that Splenda is capable of "managing . . . diabetes." Compl. ¶ 14(c). To the contrary, a reasonable consumer would understand that Splenda is suitable for consumers with diabetes *because it does not contain sugar*—which is the overarching message the labeling conveys.

"[C]laims under the California consumer-protection statutes"—such as Plaintiff's claims under the UCL, FAL, and CLRA—"are governed by the reasonable consumer test." *Dr. Pepper II*, 945 F.3d at 1228.[10] This "requires more than a mere possibility that [the] label might be misunderstood by some few consumers viewing it in an unreasonable manner." *Id.* (citation and internal quotation marks omitted). Rather, it "requires a *probability* that a significant portion of the general consuming public or of targeted

---

[10] The same "reasonable consumer" standard governs Plaintiff's claims for breach of express warranty and unjust enrichment. *See Weiss v. Trader Joe's Co.*, 838 F. App'x 302, 303 (9th Cir. 2021); *Girard v. Toyota Motor Sales, U.S.A., Inc.*, 316 F. App'x 561, 563 (9th Cir. 2008).

consumers, acting reasonably in the circumstances, could be misled." *Id.* at 1228–29 (emphasis added). Moreover, the dispositive question under this standard is "whether the labeling of the products is misleading as a whole." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1099 (9th Cir. 2023); *see also Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995) (same). For that reason, "product packaging should be examined in its full context because it would be unreasonable to cherry-pick discrete statements to prove deception." *Weiss*, 838 F. App'x at 303; *see also, e.g.*, *Hairston v. S. Beach Beverage Co.*, No. 12-1429, 2012 WL 1893818, at *4 (C.D. Cal. May 18, 2012) ("Plaintiff's selective interpretation of individual words or phrases from a product's labeling cannot support a CLRA, FAL, or UCL claim.").

Here, Plaintiff alleges that the representations at issue—such as "suitable for people with diabetes," "#1 Recommended Brand by Doctors and Dieticians," and "Diabetes Care"—"mean that the Products can aid in managing [diabetics'] blood sugar and/or are suitable for their diabetic condition" and that they are "uniquely healthy sugar alternatives." Compl. ¶¶ 49–50. But no reasonable consumer would interpret these claims to mean that Splenda is capable of treating diabetes. Instead, when viewed alongside the remainder of the labeling, a reasonable consumer would understand them to mean that Splenda is suitable for people with diabetes because it does not contain sugar—which Plaintiff does not and cannot dispute.

*Horti v. Nestle HealthCare Nutrition, Inc.* is directly on point. There, Judge Hamilton dismissed a lawsuit alleging that the labeling of Boost Glucose Control shakes—which stated that the products "help manage blood sugar" and are "designed for people with diabetes"—falsely implied that "the products control glucose" and "would have some affirmatively therapeutic impact on their blood glucose levels or otherwise mitigate, treat, or prevent pre-diabetes or diabetes." No. 21-9812, 2022 WL 16748613, at *1 (N.D. Cal. Nov. 7, 2022). In reaching this conclusion, Judge Hamilton noted that the "labels on Boost Glucose Control describe them as 'balanced nutritional drinks' and clearly disclose the number of carbohydrates and grams of sugar each drink contains in large print on the front of the label." *Id.*

As Judge Hamilton explained, "[t]hese clear designations of the nutritional contents on the front of the label, along with the description as nutritional drinks, demonstrate that the products are a food that will necessarily impact glucose levels, not a health supplement or drug that would treat the chronic disease." *Id.* "[T]his is particularly true," Judge Hamilton noted, "for the targeted consumer group, persons with diabetes or prediabetes, who are aware of the relation between consuming sugar and blood

glucose levels." *Id.* No such consumer could reasonably "believe that the over-the-counter drink would treat or cure diabetes, a chronic disease for which there is no known cure." *Id.* at *5.[11]

Here too, the phrase "suitable for people with diabetes" does not suggest that the Products are capable of curing or treating diabetes. Instead, it communicates that the Products are "suitable for people with diabetes" *because* they do not contain sugar. Two aspects of the labeling make this clear:

First, the phrase "suitable for people with diabetes"—which appears on every Product and is the *only* challenged representation on the labeling of Splenda Liquid Sweetener, Splenda Water Enhancer, Splenda Premium Sweet Tea, and Splenda Multi-Use Syrup—appears only in small print on the back label next to the Nutrition Facts panel and the ingredient list. *See* Compl. ¶ 7. Because the back label also notes that the product contains sucralose and is free of sugar, a reasonable consumer would not construe the statement "suitable for people with diabetes" to convey anything *other* than the absence of sugar. *See, e.g.*, *Hodges v. King's Hawaiian Bakery W., Inc.*, No. 21-4541, 2021 WL 5178826, at *7 (N.D. Cal. Nov. 8, 2021) ("A reasonable consumer is not free to ignore the ingredient list on a food package.").

Second, the labeling of each Product includes *other* representations that emphasize the absence of sugar—such as "Zero Calorie Sweetener," "No Added Sugar," "Tastes Like Sugar," "0 Sugar Calories Carbs," "Sugar Free," and "Zero Calorie, Zero Sugar Alternative." Viewed as a whole, the labeling makes clear that the Products are "suitable for people with diabetes" and "diabetes care" products *because* they are free of sugar. *See, e.g.*, *Weiss*, 838 F. App'x at 303 (noting that "product packaging should be examined in its full context because it would be unreasonable to cherry-pick discrete statements to prove deception") (citing *Freeman*, 68 F.3d at 290); *Kennard v. Kellogg Sales Co.*, No. 21-7211, 2022 WL 4241659, at *4 (N.D. Cal. Sept. 14, 2022) (dismissing lawsuit challenging representation of vegetarian

---

[11] Other courts are in accord. In *Weiss*, for example, the Ninth Circuit affirmed the dismissal of a lawsuit alleging that the phrase "ionized to achieve the perfect balance," as used on the labeling of bottled water, misled the plaintiff "into believing that the water balances her internal bodily pH." 838 F. App'x at 303. "When considered within the context of the water bottle packaging as a whole," the court explained, "[n]o reasonable consumer would interpret that statement to mean that the water itself will balance the consumer's own pH levels." *Id.* Another court recently dismissed a lawsuit challenging the labeling of cosmetics as "suitable for sensitive skin," even though they were allegedly "unsafe due to the presence of purportedly harmful PFAS." *Solis v. Coty Inc.*, No. 22-400, 2023 WL 2394640, at *6 (S.D. Cal. Mar. 7, 2023). The court found there was no "misrepresentation" because "suitable for sensitive skin" was not a promise that the product was safe or PFAS-free—or, in other words, that there was not "a cogent nexus" between the label statement and the plaintiff's purported interpretation of the labeling. *Id.* at *6-7.

products as "veggie" products and noting that "the majority of the photographs on the packaging show the Products clearly mimicking meat as vegetarian meat substitutes" and that "[c]onsumers can also readily identify the actual ingredients in the Veggie Products from the ingredient list").

Similarly, while Plaintiff challenges the representation that Splenda Diabetes Care shakes "help[] manage blood sugar" and are a "diabetes care" product, the labeling makes clear that those claims are based on the absence of sugar. *See Horti*, 2022 WL 16748613, at *4 (dismissing lawsuit challenging claims that Boost Glucose Control shakes "help manage blood sugar" and are "designed for people with diabetes" where the label "demonstrate[s] that the products are a food that will necessarily impact glucose levels, not a health supplement or drug that would treat the chronic disease"). Indeed, TC Heartland's use of these statements accords with the FDA's finding that the "use of an artificial sweetener in food" in lieu of sugar is a "special dietary use" appropriate for "the diets of diabetics." 21 C.F.R. § 105.3(a)(2); *see also Coca-Cola Bottling Co.*, 563 F. Supp. at 1134 n.45 (noting that "[d]rinks with artificial sweeteners" are considered "special dietary foods" under 21 C.F.R. § 105.3(a)(2)).

Finally, Plaintiff's challenge to the statements "from the #1 sweetener brand recommended by doctors and dieticians" and "#1 recommended brand by doctors and dieticians" also fails because he does not allege that they are untrue. Plaintiff offers no reason to believe that Splenda is not the #1 sweetener brand recommended by healthcare professionals. It is irrelevant that Plaintiff subjectively interpreted these statements to mean that the Products are "healthy" or "provide diabetes and/or blood sugar management benefits." Compl. ¶ 9. The Ninth Circuit has made clear that "California's consumer protection laws do not require [a manufacturer] to anticipate and affirmatively dispel . . . shoppers' idiosyncratic assumptions or wholly incorrect interpretations of its advertising." *Thomas v. Costco Wholesale Corp.*, No. 21-55335, 2022 WL 636637, at *2 (9th Cir. Mar. 4, 2022). Absent any plausible allegation that Splenda is *not* the "#1 recommended sweetener brand recommended by doctors and dieticians," this statement does not give rise to a plausible claim of deception.

## **CONCLUSION**

This Court should dismiss Plaintiff's lawsuit with prejudice and without leave to amend.

1    DATED:  October 17, 2023        JENNER & BLOCK LLP

2                        By:       /s/ Dean N. Panos

3                                 Dean N. Panos
                                 Alexander M. Smith

4                                  Kelly M. Morrison

5                          Attorneys for Defendant TC Heartland, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28