**JENNER & BLOCK LLP**
Alexander M. Smith (SBN 295187)
asmith@jenner.com
Kelly M. Morrison (SBN 255513)
kmorrison@jenner.com
515 S. Flower Street, Suite 3300
Los Angeles, CA 90071-2054
Telephone:    (213) 239-5100
Facsimile:    (213) 239-5199

Dean N. Panos (*pro hac vice*)
dpanos@jenner.com
353 N. Clark Street
Chicago, IL 60654-3456
Telephone:    (312) 222-9350
Facsimile:    (312) 527-0484

Attorneys for Defendant
TC Heartland LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN PRESCOTT, RICHARD TILKER, SAMUEL GARCIA, and ROCHELLE WILSON, individually and on behalf of all others similarly situated,<br><br>                          Plaintiffs,<br><br>        v.<br><br>TC HEARTLAND LLC,<br><br>                          Defendant. | Case 5:23-cv-4192-PCP<br><br>The Honorable P. Casey Pitts<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Hearing Date:  March 28, 2024<br>Hearing Time:  10:00 a.m.<br>Courtroom:    8 (San Jose) |

TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that, on March 28, 2024, at 10:00 a.m., or as soon thereafter as the Court is available, in Courtroom 8 of the federal courthouse located at 280 South First Street, San Jose, CA, 95113, Defendant TC Heartland LLC will, and hereby does, move to dismiss Plaintiffs' First Amended Class Action Complaint because it: (1) fails to state a plausible claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6); and (2) fails to plead an injury-in-fact, mandating dismissal under Federal Rule of Civil Procedure 12(b)(1).

TC Heartland's Motion is based on this Notice of Motion and Motion, the following Memorandum of Points and Authorities, the attached Appendix, the concurrently submitted Request for Judicial Notice, Declaration of Alexander M. Smith, and exhibits attached thereto, any additional briefing on this subject (including TC Heartland's reply brief), and the evidence and arguments that will be presented to the Court at the hearing on this matter.


DATED:  January 16, 2024                    JENNER & BLOCK LLP


                                    By:    _____/s/ Dean N. Panos_____
                                           Dean N. Panos
                                           Alexander M. Smith
                                           Kelly M. Morrison

                                    Attorneys for Defendant
                                    TC Heartland LLC

1

## **TABLE OF CONTENTS**

2

INTRODUCTION AND STATEMENT OF ISSUES ...................................................................1

3

BACKGROUND ..........................................................................................................................3

4

I.    After Evaluating More Than 100 Studies and Clinical Trials, the FDA Approved Sucralose

5

as Safe for Human Consumption—And Recently Reaffirmed That Sucralose Remains Safe..........3

6

II.    Allegations of the Complaint. ...................................................................................5

7

ARGUMENT ...............................................................................................................................7

8

I.    The FDA's Determination That Sucralose Is Safe for Consumers With and Without

9

Diabetes Preempts Plaintiffs' Claims, Which Seek to Second-Guess That Determination. .............8

10

II.    The FDA's Determination That Sucralose Is Safe Renders Plaintiffs' Claims Implausible. ..........11

11

    A.    The FDA's finding that sucralose is safe for consumption and serves a "special

12

dietary use" in the management of diabetes defeats the factual premise of Plaintiffs' claims. ...................................................................................................................11

13

    B.    The studies Plaintiffs cite do not support their claim that sucralose is unsafe. ......................12

14

        1.    The studies Plaintiffs cite do not establish causation or foreclose reverse

15

causation. ........................................................................................................15

16

        2.    Many of Plaintiffs' cited studies do not involve the Products—or even

sucralose..........................................................................................................17

17

        3.    Findings from animal studies cannot be extrapolated to humans. ...................................18

18

III.    Plaintiffs' Claims of Economic Injury Are Neither Cognizable Nor Plausible...............................19

19

    A.    Absent any plausible allegation that sucralose is unsafe, Plaintiffs have not suffered

20

any cognizable physical or economic injury and therefore lack Article III standing. .............19

21

    B.    The Products' labeling is not likely to mislead reasonable consumers. ...................................21

22

        1.    The phrase "Suitable for People with Diabetes" is not misleading. ...............................22

23

        2.    "#1 Recommended Brand by Doctors and Dieticians" is also not misleading..............23

24

        3.    The labeling of the "Diabetes Care" shakes is not misleading. ......................................24

25

IV.    Plaintiffs' Request for "Corrective Advertising" Violates the First Amendment. ...........................25

26

CONCLUSION...........................................................................................................................25

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
5

*Alamilla v. Hain Celestial Grp., Inc.*,
    30 F. Supp. 3d 943 (N.D. Cal. 2014) ..................................................................................13

6

*Amado v. Procter & Gamble Co.*,
    No. 22-5427, 2023 WL 3898984 (N.D. Cal. June 8, 2023) ...........................................14, 24

7
8

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................................................................8

9
10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................2, 7

11

*Backus v. Gen. Mills, Inc.*,
    122 F. Supp. 3d 909 (N.D. Cal. 2015) ..................................................................................13

12
13

*Becerra v. Coca-Cola Co.*,
    No. 17-5916, 2018 WL 1070823 (N.D. Cal. Feb. 27, 2018) ................................................14

14
15

*Becerra v. Dr. Pepper/Seven-Up, Inc.*,
    945 F.3d 1225 (9th Cir. 2019) .........................................................................................14, 21

16

*Becerra v. Dr. Pepper/Seven-Up, Inc.*,
    No. 17-5921, 2018 WL 1569697 (N.D. Cal. Mar. 30, 2018) ..........................................14, 16

17
18

*Bowen v. Energizer Holdings, Inc.*,
    No. 21-4356, 2023 WL 1786731 (C.D. Cal. Jan. 5, 2023) ...................................................12

19
20

*Boysen v. Walgreen Co.*,
    No. 11-6262, 2012 WL 2953069 (N.D. Cal. July 19, 2012) .................................................20

21

*Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*,
    29 F.4th 468 (9th Cir. 2022) .................................................................................................25

22
23

*Chobani, LLC v. Dannon Co.*,
    157 F. Supp. 3d 190 (N.D.N.Y. 2016) .............................................................................11, 12

24
25

*Coca-Cola Bottling Co. v. Coca-Cola Co.*,
    563 F. Supp. 1122 (D. Del. 1983) ........................................................................................9, 24

26

*Cohen v. Apple Inc.*,
    46 F.4th 1012 (9th Cir. 2022) ..............................................................................8, 9, 10, 11

27
28

*Domingo ex rel. Domingo v. T.K.*,
    289 F.3d 600 (9th Cir. 2002) ................................................................................................18

*Eckler v. Wal-Mart Stores, Inc.*,
    No. 12-727, 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012) .........................................14, 17

*Excevarria v. Dr. Pepper Snapple Grp., Inc.*,
    764 F. App'x 108 (2d Cir. 2019) .................................................................................14

*Geffner v. Coca-Cola Co.*,
    343 F. Supp. 3d 246 (S.D.N.Y. 2018).......................................................................13, 17

*Geffner v. Coca-Cola Co.*,
    928 F.3d 198 (2d Cir. 2019)............................................................................................13

*In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*,
    No. 21-269, 2022 WL 10197651 (E.D. Va. Oct. 17, 2022)..........................................9, 20

*Girard v. Toyota Motor Sales, U.S.A., Inc.*,
    316 F. App'x 561 (9th Cir. 2008) ..................................................................................21

*Gordon v. Church & Dwight Co.*,
    No. 09-5585, 2010 WL 1341184 (N.D. Cal. Apr. 2, 2010) ............................................8

*Hartwich v. Kroger Co.*,
    No. 20-1253, 2021 WL 4519019 (C.D. Cal. Sept. 20, 2021) ........................................23

*Herrington v. Johnson & Johnson Consumer Cos.*,
    No. 09-1597, 2010 WL 3448531 (N.D. Cal. Sept. 1, 2010) ......................................11, 12

*Hodges v. King's Hawaiian Bakery W., Inc.*,
    No. 21-4541, 2021 WL 5178826 (N.D. Cal. Nov. 8, 2021) ..........................................22

*Horti v. Nestle Healthcare Nutrition, Inc.*,
    No. 22-16832, 2023 WL 8613601 (9th Cir. Dec. 13, 2023)..........................................25

*Kardovich v. Pfizer, Inc.*,
    97 F. Supp. 3d 131 (E.D.N.Y. 2015) ............................................................................14

*Kennard v. Kellogg Sales Co.*,
    No. 21-7211, 2022 WL 4241659 (N.D. Cal. Sept. 14, 2022) ........................................23

*Kimca v. Sprout Foods, Inc.*,
    No. 21-12977, 2022 WL 1213488 (D.N.J. Apr. 25, 2022)..........................................12, 20

*Koronthaly v. L'Oreal USA, Inc.*,
    374 F. App'x 257 (3d Cir. 2010) ...................................................................................12

*Kwan v. SanMedica Int'l*,
    854 F.3d 1088 (9th Cir. 2017) ......................................................................7, 13, 14, 15

*Kwan v. SanMedica Int'l, LLC*,
    No. 14-3287, 2015 WL 848868 (N.D. Cal. Feb. 25, 2015) ........................................13, 17

MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 5:23-cv-4192-PCP

*Manuel v. Pepsi-Cola Co.,*
No. 17-7955, 2018 WL 2269247 (S.D.N.Y. May 17, 2018) ..................................16, 17

*McGinity v. Procter & Gamble Co.,*
69 F.4th 1093 (9th Cir. 2023) ...........................................................................22

*Nat'l Ass'n of Wheat Growers v. Bonta,*
85 F.4th 1263 (9th Cir. 2023) ...........................................................................25

*Satchell v. Sonic Notify, Inc.,*
234 F. Supp. 3d 996 (N.D. Cal. 2017) ...............................................................21

*Solis v. Coty Inc.,*
No. 22-400, 2023 WL 2394640 (S.D. Cal. Mar. 7, 2023) ..........................................23

*Spector v. Mondelēz Int'l, Inc.,*
No. 15-4298, 2017 WL 4283711 (N.D. Ill. Sept. 27, 2017) ........................15, 17

*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) .......................................................................................19

*Sugar Ass'n v. McNeil-PPC, Inc.,*
No. 04-10077, 2008 WL 11338092 (C.D. Cal. July 21, 2008) ........................18

*Thomas v. Costco Wholesale Corp.,*
No. 21-55335, 2022 WL 636637 (9th Cir. Mar. 4, 2022) ...............................24

*United States v. Kaplan,*
836 F.3d 1199 (9th Cir. 2016) ...........................................................................8

*Walker v. B&G Foods, Inc.,*
No. 15-3772, 2016 WL 463253 (N.D. Cal. Feb. 8, 2016) ...............................8

*Weiss v. Trader Joe's Co.,*
838 F. App'x 302 (9th Cir. 2021) ....................................................21, 22, 23, 24

*Zauderer v. Office of Disciplinary Counsel,*
471 U.S. 626 (1985) .....................................................................................3, 25

**Statutes**

21 U.S.C. § 342 ................................................................................... *passim*

21 U.S.C. § 348 ................................................................................... *passim*

21 U.S.C. § 393 ...........................................................................................8

**Other Authorities**

21 C.F.R. § 105.3 ................................................................................................................ *passim*

21 C.F.R. § 172.831 ................................................................................................................4, 9

FDA, *Food Additives Permitted for Direct Addition to Food for Human Consumption; Sucralose*, 63 Fed. Reg. 16417-01 (Apr. 3, 1998) ........................................................ *passim*

FDA, *Food Labeling: Revision of the Nutrition & Supplement Facts Labels*, 81 Fed. Reg. 33742 (May 27, 2016)..........................................................................................................5, 10

1

## <u>INTRODUCTION AND STATEMENT OF ISSUES</u>

2    This consumer class action concerns Splenda, a low-calorie sweetener that millions of Americans

3    use as a substitute for sugar.  The FDA determined decades ago that sucralose, the sweetening agent in

4    Splenda, is safe for consumption and has no adverse effect on the body's ability to regulate blood glucose

5    levels.  The FDA reached this conclusion after an exhaustive, decade-long review of the scientific

6    literature—including over 100 studies and multiple clinical trials intended to assess whether sucralose

7    poses health risks to consumers with diabetes.  Based on that review, the FDA found that "sucralose has

8    no adverse health effects on short-term or long-term glucose homeostasis or any other adverse effect in

9    diabetic patients."  FDA, *Food Additives Permitted for Direct Addition to Food for Human Consumption;*

10    *Sucralose*, 63 Fed. Reg. 16417-01, 16430 (Apr. 3, 1998).  The FDA then approved sucralose as a general-

11    purpose sweetener—which, under the federal Food, Drug, & Cosmetic Act ("FDCA"), reflects the FDA's

12    reasoned judgment that sucralose is "not injurious" to human health.  21 U.S.C. §§ 342(a)(1), 348(a).

13    Plaintiffs now ask this Court to substitute its judgment for that of the FDA.  Relying on a cherry-

14    picked assortment of studies (which they repeatedly mischaracterize), Plaintiffs claim that sucralose "has

15    been shown to cause and worsen diabetes, among other harms."  First Am. Compl. ("FAC") ¶ 1.  Plaintiffs

16    therefore allege that it is misleading for TC Heartland to label its Splenda-branded products (the

17    "Products") as "suitable for people with diabetes," to state that they "help[] manage blood sugar," to

18    highlight that Splenda is the "#1 recommended brand by doctors and dietitians," or to sell Splenda-

19    sweetened "Diabetes Care" shakes.  *Id.* ¶ 4.  While Plaintiffs frame their lawsuit as a garden-variety false

20    advertising case, it ultimately seeks to second-guess the FDA's repeated, consistent determination that

21    sucralose is safe for consumption and that its presence does not render food "injurious to health."

22    That finding is fatal to Plaintiffs' lawsuit in multiple ways.  It renders Plaintiffs' lawsuit—which

23    attempts to use California's consumer protection statutes to challenge the FDA's finding that sucralose is

24    safe and not "injurious to health"—preempted.  It also forecloses any plausible allegation that sucralose

25    is unsafe or that the labeling claims at issue are deceptive.  And while Plaintiffs allege that they suffered

26    an *economic* injury due to the use of the challenged labeling statements, those claims fail—both because

27    Plaintiffs cannot establish a cognizable injury-in-fact and because no reasonable consumer would interpret

28    the labeling in the way Plaintiffs allege.  This Court should dismiss this lawsuit for three reasons:

First, Plaintiffs' lawsuit is preempted because it seeks to second-guess the FDA's determination that sucralose is safe for human consumption and suitable for consumers with diabetes. The FDCA charges the FDA, rather than private plaintiffs, with regulating the safety of the food supply and determining whether food is safe for human consumption. To that end, when the FDA approves the use of a food additive, the FDCA makes clear that a food cannot be deemed "adulterated" (*i.e.*, "injurious to health") because it contains the approved food additive. *See* 21 U.S.C. §§ 342(a)(1), 348(a)(3). Here, Plaintiffs do not (and cannot) dispute that the FDA has deemed sucralose safe for consumers with and without diabetes based on an exhaustive review of the scientific evidence. It does not matter whether Plaintiffs agree with the FDA's assessment of the literature. Nor does it matter that Plaintiffs have framed this case as a false advertising lawsuit. What matters is that Plaintiffs' lawsuit relies on the premise that sucralose is "injurious to health" for people with diabetes—a premise that the FDA has squarely rejected.

Second, the FDA's finding that sucralose is safe for human consumption also renders Plaintiffs' claims implausible—and thus subject to dismissal under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).[1] Where the FDA has determined that a substance is safe, courts routinely dismiss false advertising lawsuits premised on the theory that the challenged substance is unsafe. Here too, the FDA has determined that sucralose is safe, that it is not "injurious to health," and that it serves a "special dietary use" in managing diabetes and controlling calorie intake. Because Plaintiffs' claims all rely on the premise that sucralose is *unsafe*, the FDA's finding to the contrary defeats Plaintiffs' claims of deception.

Plaintiffs try to avoid this result by citing an assortment of articles that purportedly prove that "sucralose has been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes itself by interfering with bodily responses responsible for controlling glucose and energy homeostasis." FAC ¶ 30. But those articles do not go nearly as far as Plaintiffs claim. To the contrary, the studies Plaintiffs cite concede that there is no "proof" that sucralose or other low-calorie sweeteners "cause metabolic disorders in human subjects." Ex. 1, at 8.[2] As one of those studies notes, the "effects of sucralose

---

[1] Unless otherwise noted, all emphasis is added and all citations and internal quotation marks are omitted.

[2] All exhibits are attached to the concurrently filed Declaration of Alexander M. Smith and are either subject to judicial notice or are incorporated by reference in the Complaint. An appendix of studies cited in the FAC (and which TC Heartland includes as exhibits) is attached to this brief.

consumption on the gut microbiota are still a matter of debate."  Ex. 2, at 11.  By their own terms, the studies Plaintiffs cite do not support the sweeping conclusions for which Plaintiffs cite them.

In any event, the limitations of these studies are apparent on their face.  Most do not test Splenda-branded products (let alone in the quantities consumers typically use), and some do not even test sucralose.  Many are animal studies whose findings cannot be extrapolated to humans.  Most importantly, none of those studies establish that Splenda-branded products—which contain a proprietary blend of sucralose, dextrose, and maltodextrin—cause any of the health problems Plaintiffs allege.  At most, some of the studies Plaintiffs cite suggest a potential *correlation* between sucralose consumption and health harms.  But that is not sufficient to second-guess the FDA's determination that sucralose is safe to consume.

Third, to the extent Plaintiffs allege that TC Heartland's use of the challenged labeling claims caused them to suffer an *economic* injury, those claims fail as well.  Absent any plausible allegation that Splenda is unsafe or caused them physical harm, Plaintiffs cannot establish that they suffered any economic injury either—which means they lack Article III standing.  Plaintiffs' effort to frame this lawsuit as a garden-variety product mislabeling case also fails because none of the claims they challenge—such as "suitable for people with diabetes" or #1 recommended brand by doctors and dietitians"—are likely to mislead reasonable consumers.  Viewed in context, all those labeling claims convey is that the Products are suitable for people with diabetes *because* they do not contain sugar.  Absent any plausible claim of deception, Plaintiffs' claims of economic injury cannot survive dismissal.

Finally, Plaintiffs seek an injunction that would force TC Heartland to engage in an "affirmative advertising campaign" to publicize the alleged dangers of sucralose.  That relief would violate the First Amendment by compelling speech that is not "purely factual and uncontroversial."  *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).  The Ninth Circuit has repeatedly applied *Zauderer* to find compelled "warnings" about product safety unconstitutional.  This Court should do the same here.

## **BACKGROUND**

### I.    **After Evaluating More Than 100 Studies and Clinical Trials, the FDA Approved Sucralose as Safe for Human Consumption—And Recently Reaffirmed That Sucralose Remains Safe.**

Splenda is a brand of low-calorie sweeteners.  It refers not only to the eponymous sweetener—which comes in yellow packets found in millions of homes, coffee shops, and restaurants—but also to a

1   variety of products that TC Heartland sells under the Splenda brand.  Those products include syrups, liquid

2   water enhancers, sweet teas, and Splenda Diabetes Care shakes.  *See* FAC ¶ 8 (list of products at issue).

3       The primary sweetening agent found in Splenda-branded products, sucralose, is a substitute for

4   sugar that is "used to sweeten and in some cases enhance the flavor of foods."  Ex. 3; *see also* 21 C.F.R.

5   § 172.831(c) (authorizing the use of sucralose "as a sweetener in foods generally").  As the FDA has

6   recognized, "[p]eople may choose to use sweeteners instead of sugar for various reasons."  Ex. 3.  In

7   contrast to sugar, which contains four calories per gram, "sweeteners contribute only a few or no calories

8   to the diet."  *Id.*  And unlike sugar, which can raise blood glucose levels in consumers with diabetes,

9   sweeteners like sucralose "generally will not raise blood sugar."  *Id.*  Indeed, the FDA has expressly stated

10  that sweeteners like sucralose can be "use[d] for regulation of the intake of calories and available

11  carbohydrate, or for use in the diets of diabetics."  21 C.F.R. § 105.3(a)(2).

12      As part of its duty to regulate the safety of the food supply, the "FDA assesses the safety of a

13  sweetener by evaluating the available safety information about the sweetener to identify potential hazards

14  and determine a safe level of exposure."  Ex. 3.  Beginning in 1987, the FDA did just that.  It reviewed

15  "more than 110 studies designed to identify possible toxic effects" of sucralose, as well as "human clinical

16  trials to address metabolism and effects on patients with diabetes."  *Id.*  After conducting this extensive

17  review, the FDA concluded in 1998 that "sucralose has no adverse health effects on short-term or long-

18  term glucose homeostasis or any other adverse effect in diabetic patients."  63 Fed. Reg. at 16430.

19      As the FDA explained, the studies it reviewed showed that sucralose "has no influence on insulin

20  secretion by rats or humans," "has no effect on postprandial or fasting blood glucose levels in animals or

21  humans," and "causes no changes in intestinal absorption of glucose or fructose."  *Id.*  The FDA also

22  observed that "sucralose has no effect on glucose utilization or on any of the key enzymes modulating

23  glucose metabolism or storage" and that "administration of sucralose results in no clinical or pathological

24  symptoms similar to those observed in diabetes mellitus."  *Id.*  In other words, the FDA emphasized that

25  it had "no safety concerns regarding the use of sucralose by diabetic individuals."  *Id.*

26      The FDA then "established an acceptable daily intake (ADI) level," which "is the amount of

27  [sucralose] considered safe to consume each day over a person's lifetime."  Ex. 3.  The ADI for sucralose

28  is 5 mg per kilogram of body weight per day, which is equivalent to 23 packets of Splenda per day for a

person who weighs 60 kilograms (or 132 pounds). *Id.* In other words, the FDA determined that sucralose "does not pose safety concerns if the estimated daily intake is less than" the ADI—which, for many adults, equates to more than two dozen packets of Splenda *each day* over the course of their lifetime. *Id.* And because "sucralose is about 600 times sweeter than sugar" (*id.*), the FDA has recognized that consumers "don't need to use much" sucralose to sweeten their coffee, tea, or food. Ex. 4.

The FDA's approval of sucralose as an all-purpose food additive means, as a matter of law, that its presence does not render a food "adulterated." The FDCA provides that a food is "adulterated" if, among other things, it is "injurious to health." 21 U.S.C. § 342(a)(1). A food is *not* "adulterated"—*i.e.*, is not "injurious to health"—simply because it contains an FDA-approved food additive. *See* 21 U.S.C. § 348(a) ("[A] food shall not, by reason of bearing or containing . . . a food additive in accordance with the regulation or notification, be considered adulterated under section 342(a)(1) . . . ."). In other words, the FDA's approval of sucralose reflects its expert determination that sucralose, when used consistent with its approved conditions of use, cannot be considered "injurious to health" or unsafe.

Although the FDA approved sucralose for use as an all-purpose sweetener over 25 years ago, it "continues to monitor the latest science available on sweeteners in a variety of ways." Ex. 3. Among other things, it "stay[s] abreast of published literature and the current level of consumer exposure," "participate[s] in international scientific and standard-setting activities related to food ingredient safety," and regularly "reassess[es] the science about the exposure and safety of . . . sweetener[s]." *Id.* To that end, when the FDA updated its regulations in 2016 to require a declaration of added sugars in the Nutrition Facts panel, it once again rejected several comments suggesting that "low-calorie sweeteners may be harmful to health." FDA, *Food Labeling: Revision of the Nutrition & Supplement Facts Labels*, 81 Fed. Reg. 33742, 33819 (May 27, 2016). Instead, the FDA reiterated that "there is no convincing evidence of a cause and effect relationship between these sweeteners and negative health effects in humans." *Id.*

## II.   Allegations of the Complaint.

Despite the FDA's repeated findings that sucralose is safe for human consumption and that it is not "injurious to health," Plaintiffs allege that, "according to science yet unknown to consumers, sucralose negatively affects pancreatic beta cells" and thereby "promote[s] insulin resistance, destabilizes glucose absorption, causes obesity, and harms the gut microbiome." FAC ¶ 5; *see also id.* ¶ 30 ("[S]ucralose has

been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes itself by interfering with bodily responses responsible for controlling glucose and energy homeostasis.").  Although Plaintiffs acknowledge that the FDA has "approved sucralose as a general-purpose sweetener" (*id.* ¶ 49), they nonetheless allege—based on a hodgepodge of studies and "meta-analyses," as well as public statements from the World Health Organization ("WHO")[3] and the Center for Science in the Public Interest ("CSPI")—that sucralose is unsafe for consumption.[4]  *See id.* ¶¶ 30–44.[5]

Based on this allegation, Plaintiffs allege that it is misleading for TC Heartland to label the Products with the phrases "suitable for people with diabetes," "helps manage blood sugar," "#1 recommended brand by doctors and dieticians," "#1 sweetener brand recommended by doctors and dieticians," and "Diabetes Care."  *See id.* ¶¶ 4–6.  Plaintiffs assert that these representations suggest that "the Products are healthy sugar alternatives that are also suitable for, or can aid in, the management of blood sugar generally and for those with diabetes specifically."  *Id.* ¶ 5.  But because the Products contain sucralose, Plaintiffs claim that "they are neither healthy nor suitable for these purposes."  *Id.*

---

[3] Although Plaintiffs allege that the WHO has advised consumers not to use sucralose to minimize the risk of diabetes or to reduce calorie consumption (*see* FAC ¶ 2, 46), the WHO expressly noted that its recommendation did not apply to "individuals with pre-existing diabetes."  Ex. 5, at 2.  The WHO also made clear that its recommendation to avoid low-calorie sweeteners was a "conditional" recommendation, as "the link observed in the evidence between NSS [non-sugar sweeteners] and disease outcomes might be confounded by baseline characteristics of study participants and complicated patterns of NSS use."  *Id.*

[4] Plaintiffs also allege that "a six-month clinical test on sucralose conducted during the first round of FDA-approval found sucralose to have a *negative* effect on blood sugar."  FAC ¶ 50 (emphasis in original).  But as the FDA noted, McNeil Specialty Products, which owned the Splenda brand prior to its sale to TC Heartland, responded to the findings of this study by "initiat[ing] additional studies with the main objective of evaluating the effects sucralose would have on glucose homeostasis in patients with diabetes mellitus."  63 Fed. Reg. at 16418.  After reviewing these "additional studies," the FDA concluded—in no uncertain terms—that "sucralose has no adverse health effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetic patients."  *Id.* at 16430.

[5] Plaintiffs also make a half-hearted attempt to challenge the safety of carrageenan.  *See* FAC ¶ 45.  But as Plaintiffs admit, the only Product that contains carrageenan is the Diabetes Care shake.  *See id.*; *see also id.* at pp. 5–17 (showing Product ingredients).  In any event, the single study Plaintiffs cite does not support their broad allegation that carrageenan causes diabetes or worsens its symptoms.  *See* Ex. 6 (mouse study asserting that "carrageenan exposure may exacerbate the harmful effects of the high fat diet").  Indeed, that study tentatively concluded only that the elimination of carrageenan "*may* help in efforts to reduce the incidence of diabetes and its associated morbidities."  *Id.*

1    Critically, Plaintiffs do not allege that they (or any other consumer) suffered any physical harm

2    from consuming the Products.  Nor do they allege that the Products made it more difficult for them to

3    manage their blood sugar.  Instead, Plaintiffs allege an *economic* injury—*i.e.*, that they "would not have

4    purchased the Products, or would not have paid as much for them, had [they] known they could not provide

5    the advertised benefits." *Id.* ¶¶ 16(d), 17(d), 18(d), 19(d), 96.  Based on this theory, Plaintiffs assert

6    California-law consumer fraud claims on behalf of a putative California class and claims for breach of

7    express warranty and unjust enrichment on behalf of a putative nationwide class.  *See id.* ¶¶ 86–157.

8                                            **ARGUMENT**

9    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as

10   true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.  Facts indicating the

11   "mere *possibility* of misconduct" do not suffice. *Id.* at 679.  "[C]onclusory allegations" and "unwarranted

12   inferences" are also "insufficient to avoid dismissal." *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th

13   Cir. 2017) (*Kwan II*).  Rather, Plaintiffs must plead sufficient "factual content to nudg[e] [their] claim . . .

14   across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 683.

15   Here, Plaintiffs' claims all hinge on the allegation that "sucralose has been shown to cause and

16   worsen diabetes, among other harms." FAC ¶ 1.  But because the FDA has approved sucralose as a food

17   additive, the FDCA makes clear that the Products cannot be deemed "injurious to health" simply because

18   they contain sucralose.  21 U.S.C. §§ 342(a)(1), 348(a).  That finding not only renders Plaintiffs' claims

19   preempted, but also fatally undermines the core factual allegation on which their entire lawsuit hinges.

20   And as explained below, the studies and articles Plaintiffs cite do not change this result.  Even if this Court

21   were inclined to re-weigh the evidence the FDA already considered, the materials Plaintiffs cite do not

22   support the broad claims for which Plaintiffs cite them—even if one takes those materials at face value.

23   Plaintiffs' efforts to evade dismissal based on allegations of "economic" injury also fail.  Absent

24   any plausible allegation that sucralose is unsafe, Plaintiffs cannot establish either a physical or economic

25   injury—which means they lack Article III standing.  And even if Plaintiffs *had* standing, their claims of

26   economic injury fail on the merits because the labeling is not likely to mislead reasonable consumers.

27

28

1
2

I.      **The FDA's Determination That Sucralose Is Safe for Consumers With and Without Diabetes Preempts Plaintiffs' Claims, Which Seek to Second-Guess That Determination.**

3
4
5
6
7
8

Conflict preemption occurs when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012).  Federal regulatory action "need not specify its preemptive force in order . . . to have such force." *Cohen v. Apple Inc.*, 46 F.4th 1012, 1028 (9th Cir. 2022).  Rather, "[u]nder the doctrine of implied conflict preemption, the statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *Id.*  As one court put it:

9
10
11
12

> When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives.  Allowing state law to impose a different standard permits a re-balancing of those considerations.  A state-law standard that is more protective of one objective may result in a standard that is less protective of others.

13
14
15

*Id.* at 1029.  Viewed through this lens, Plaintiffs' claims are preempted—not only because they conflict with the FDA's determination that sucralose is safe, but also because they seek to use state law to usurp the FDA's authority to decide whether a substance is safe or "injurious to health."

16
17
18
19
20
21
22
23

There can be no dispute that federal law charges the FDA with regulating the safety of the food supply.  The FDCA "subjects the food industry to comprehensive regulation" by the FDA, which Congress has empowered to regulate food safety.  *Walker v. B&G Foods, Inc.*, No. 15-3772, 2016 WL 463253, at *5 (N.D. Cal. Feb. 8, 2016); *see also United States v. Kaplan*, 836 F.3d 1199, 1208 (9th Cir. 2016) ("The FDCA's overall purpose is to protect consumers from dangerous products.").  To that end, the FDA aims to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner" and ensures that "foods are safe, wholesome, sanitary, and properly labeled."  21 U.S.C. § 393(b)(1), (2)(A).

24
25
26
27
28

As part of its role in regulating the safety of the food supply, the FDA employs its scientific and technical expertise to review scientific studies and other evidence regarding foods and food additives to determine whether they are safe for human consumption.  *See Walker*, 2016 WL 463253, at *6; *Gordon v. Church & Dwight Co.*, No. 09-5585, 2010 WL 1341184, at *2 (N.D. Cal. Apr. 2, 2010) (noting that the FDA's "regulatory role" involves "interpret[ing] scientific studies or other evidence" to determine

1    whether FDA-regulated products are safe).  As one court explained, "[d]etermining whether . . . products

2    [are] at risk of containing *harmful* levels of [a particular component] is a technical and policy consideration

3    within the FDA's field of expertise."  *In re Gerber Prods. Co. Heavy Metals Baby Food Litig.*, No. 21-

4    269, 2022 WL 10197651, at *13 (E.D. Va. Oct. 17, 2022) (emphasis in original).

5           Critically, once the FDA decides that a food additive is safe for consumption, that determination

6    carries the force of law.  As explained above, the FDCA provides that a food is "adulterated" if it is

7    "injurious to health."  21 U.S.C. § 342(a)(1).  It also provides that a food is *not* "adulterated"—or is not

8    "injurious to health"—simply because it contains an FDA-approved food additive.  *See* 21 U.S.C. § 348(a)

9    ("[A] food shall not, by reason of bearing or containing . . . a food additive in accordance with the

10   regulation or notification, be considered adulterated under section 342(a)(1) . . . .").  In other words, the

11   FDCA expressly contemplates that the FDA, by approving a food additive, has determined that it cannot

12   be considered "injurious to health" when used consistent with its approved conditions of use.

13          Nor can there be any dispute that the FDA drew upon its experience in evaluating sucralose in

14   making a "reasoned judgment" about its safety.  *Cohen*, 46 F.4th at 1029.  Between 1987 and 1998, the

15   FDA conducted an exhaustive review of the scientific literature and requested additional data regarding

16   the effects of sucralose on consumers with diabetes.  *See* 63 Fed. Reg. at 16430.  After doing so, the FDA

17   concluded that sucralose is safe for human consumption and that it could be "used as a sweetener in food

18   generally."  21 C.F.R. § 172.831(c).  It specifically determined that "sucralose has no adverse health

19   effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetes patients."

20   63 Fed. Reg. at 16430.  "[B]ecause sucralose has no influence on insulin's action on blood glucose levels,"

21   the FDA noted, "it would not be anticipated to result in difficulties with insulin-based management of

22   diabetes."  *Id.*  Based on "the data in the clinical studies and other available information in the sucralose

23   database," the FDA had "no safety concerns regarding the use of sucralose by diabetic individuals."  *Id.*

24          Moreover, the FDA regulations themselves make clear that sucralose is suitable for consumers

25   with diabetes.  For example, the FDA characterizes foods made with artificial sweeteners as "special

26   dietary" foods suitable "for regulation of the intake of calories and available carbohydrate, or for use in

27   the diets of diabetics."  21 C.F.R. § 105.3(a)(2); *see also Coca-Cola Bottling Co. v. Coca-Cola Co.*, 563

28   F. Supp. 1122, 1134 n.45 (D. Del. 1983) (noting that "[d]rinks with artificial sweeteners" are considered

1  "special dietary foods" under 21 C.F.R. § 105.3(a)(2)).  In other words, the FDA has expressly rejected

2  Plaintiffs' claim that sucralose-based sweeteners like Splenda are not "suitable for people with diabetes."

3      Federal law therefore preempts this lawsuit—which seeks not only to impose liability on TC

4  Heartland for selling a sweetener the FDA has approved, but also to enjoin TC Heartland from further

5  "manufacture, marketing, and sale of the Products."  FAC ¶ 12.  Indeed, the FDCA explicitly provides

6  that a product containing an approved food additive (such as sucralose) "shall not be . . . considered

7  adulterated" until a regulation approving that food additive "is revoked," and it charges the FDA with

8  determining when and how to revoke the approval of a food additive.  21 U.S.C. § 348(a)(1), (i).  Because

9  the FDCA entrusts the role of deciding when a food additive is "injurious to health" to the FDA alone,

10  Plaintiffs cannot use state law to hold TC Heartland liable for labeling the Products consistent with the

11  FDA's findings regarding sucralose—let alone to enjoin TC Heartland from selling those products.

12      Even if Plaintiffs do not specifically claim that sucralose is "adulterated," their lawsuit nonetheless

13  hinges on the allegation that sucralose is unsafe—*i.e.*, "injurious to health."  *See* FAC ¶ 1 (alleging that

14  TC Heartland engages in "consumer fraud" by marketing the Products as a "healthy sugar alternative"

15  even though they contain sucralose, which "has been shown to cause and worsen diabetes").  That is a

16  premise the FDA has rejected.  Moreover, to the extent this lawsuit seeks to hold TC Heartland liable for

17  labeling the Products as "suitable for people with diabetes" or highlighting their utility in managing blood

18  glucose, that would conflict with the FDA's determination that sucralose serves a "special dietary use[]"

19  in the management of diabetes and calorie intake.  21 C.F.R § 105.3(a).  Imposing liability under state law

20  for using a sweetener that the FDA has expressly approved and for using labeling consistent with an FDA-

21  approved "special dietary use" would undermine the careful regulatory scheme Congress set forth in the

22  FDCA—which means that this lawsuit is preempted.  *See Cohen*, 46 F.4th at 1028–29.

23      Just as importantly, imposing liability on TC Heartland for its marketing and sale of the Products

24  would also undermine the FDA's expressed goal of reducing added sugar consumption by the general

25  population.  *See* 81 Fed. Reg. at 33804 ("Added sugars consumption among the general U.S. population

26  exceeds what can reasonably be consumed within calorie limits and can have a negative impact on

27  health.").  The FDA has specifically recognized that artificial sweeteners have a "special dietary use" in

28  the management of calorie intake because they serve as a replacement for added sugar, which is one of

the leading contributors of excess calories to the diet.  21 C.F.R. § 105.3(a).  There can be no dispute that this lawsuit, which seeks to prohibit the sale of "the most recognizable and iconic low-calorie sweetener brand in the world" to millions of people who "seek out food products that are sugar-free [and] low in calories" (FAC ¶¶ 12, 22–24), poses a significant "obstacle to the full accomplishment" of the FDA's goal of reducing sugar intake.  *Cohen*, 46 F.4th at 1029.  That, too, renders this lawsuit preempted.

## II.  The FDA's Determination That Sucralose Is Safe Renders Plaintiffs' Claims Implausible.

### A.  The FDA's finding that sucralose is safe for consumption and serves a "special dietary use" in the management of diabetes defeats the factual premise of Plaintiffs' claims.

The FDA's determination that sucralose is safe and serves a "special dietary use" in the management of diabetes and calorie intake does not just preempt Plaintiffs' claims.  It also renders those claims—which all hinge on an allegation that sucralose is not safe for human consumption or suitable for people with diabetes—implausible.  Indeed, courts have routinely rejected similar efforts to second-guess the FDA's judgment that substances in consumer products—such as sucralose—are safe for consumers.

*Chobani, LLC v. Dannon Co.*, 157 F. Supp. 3d 190 (N.D.N.Y. 2016), is directly on point.  There, the court enjoined Chobani from suggesting that Dannon Light & Fit yogurt was "unsafe to consume" because it contains sucralose.  *Id.* at 203.  The court noted that sucralose "has been approved . . . for human consumption since 1999," that it "has been extensively studied," and that "the FDA has reviewed more than 110 safety studies in connection with its use as a general purpose sweetener for food."  *Id.* at 197.  In light of that background, the court rejected the proposition that "the question of sucralose's safety is still the subject of legitimate scientific debate."  *Id.* at 203.  To the contrary, it emphasized that "the balance of record evidence reflects that sucralose is an unusually well-studied compound repeatedly determined to be safe for ordinary consumption."  *Id.*

Similarly, in *Herrington v. Johnson & Johnson Consumer Cos.*, Judge Wilken dismissed a lawsuit alleging that the defendants failed to warn consumers that their children's bath products contained 1,4-dioxane, which the plaintiffs described as a "probable human carcinogen[]" to which "scientists believe there is no safe level of exposure."  No. 09-1597, 2010 WL 3448531, at *3 (N.D. Cal. Sept. 1, 2010).  In so holding, Judge Wilken noted that the FDA "stated that the 1,4-dioxane levels . . . seen in [its] monitoring of cosmetics do not present a hazard to consumers."  *Id.* at *3 n.2.  Given that finding, Judge

Wilken agreed that the plaintiffs did not plausibly "plead that the amounts of the substances in Defendants' products have caused harm or create a credible or substantial risk of harm"—as would be necessary to establish that the defendants had a duty to disclose that purported risk to consumers. *Id.* at *3.

Most recently, a California federal court dismissed a lawsuit alleging that the defendant's sunscreen was "not safe" because it contained benzene, which the plaintiff alleged to be a "known carcinogen even at low levels of exposure" based on "citations to published literature and statements from the scientific community." *Bowen v. Energizer Holdings, Inc.*, No. 21-4356, 2023 WL 1786731, at *1, 6 (C.D. Cal. Jan. 5, 2023).  In dismissing the lawsuit, the court noted that the amount of benzene allegedly present in the sunscreen (0.29 parts per million) was "less than the FDA's 2 ppm benzene limit." *Id.* at *2.  Because the plaintiff did "not allege benzene amounts higher than the FDA requirements," the court found that her allegations of a safety hazard were "entirely speculative and hypothetical." *Id.*

These cases illustrate that a plaintiff cannot plausibly allege that a substance is hazardous or unsafe to consume when the FDA has concluded that the substance "is not dangerous." *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010); *see also Kimca v. Sprout Foods, Inc.*, No. 21-12977, 2022 WL 1213488, at *7 (D.N.J. Apr. 25, 2022) (dismissing lawsuit premised on alleged failure to disclose heavy metals in baby food and noting that the FDA's statement that "children are not at an immediate health risk from exposure to toxic elements in foods" "weakens the inference that the amount of heavy metals in the Baby Food Products creates a substantial risk of danger to children").  The same is true here. In contrast to Plaintiffs' insistence that sucralose is "neither healthy nor suitable for" "the management of blood sugar generally and for those with diabetes specifically" (FAC ¶ 5), the FDA has found that sucralose is safe for consumption and that it "has no adverse health effects on short-term or long-term glucose homeostasis or any other adverse effect in diabetes patients." 63 Fed. Reg. at 16430.  Put simply, "sucralose is an unusually well-studied compound repeatedly determined to be safe for ordinary consumption," and its safety is not a "subject of legitimate scientific debate." *Chobani*, 157 F. Supp. 3d at 203.  Plaintiffs' allegations to the contrary are implausible and cannot support a viable claim.

## B.   The studies Plaintiffs cite do not support their claim that sucralose is unsafe.

Faced with the FDA's consistent determination that sucralose is safe and suitable for use by people with diabetes, Plaintiffs try to render their claims plausible by citing dozens of articles.  According to

Plaintiffs, these articles substantiate their allegation that "sucralose has been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes itself by interfering with bodily responses responsible for glucose control and energy homeostasis."  FAC ¶ 30; *see also id.* ¶¶ 31–44 (compiling studies).  But as explained above, it is not this Court's role to re-weigh evidence the FDA has already considered or to second-guess its determination that sucralose is safe.  *See Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 934 (N.D. Cal. 2015) ("Whether a body of evidence sufficiently demonstrates that a particular amount of a chemical substance poses a serious public health risk is precisely the kind of expert question that agencies are better suited to answer than courts or juries.").  Indeed, given the FDA's central role in regulating food labeling and the safety of the food supply, it cannot be the law that a plaintiff can sue a manufacturer for selling a product that the FDA has deemed safe and "not injurious"—or for labeling that product consistent with an FDA-approved "special dietary use"—simply because that plaintiff can cobble together a few scientific studies that allegedly support a contrary position.

But even if that *were* the law, Plaintiffs' claims would still fail because their cited studies do not support the sweeping claims for which Plaintiffs cite them.  *See Alamilla v. Hain Celestial Grp., Inc.*, 30 F. Supp. 3d 943, 944 (N.D. Cal. 2014) (dismissing lawsuit based on scientific articles and noting that a court "need not accept as true" a plaintiff's characterization of scientific studies if the studies themselves do not support the plaintiff's allegations).  A plaintiff cannot rely on studies or articles to challenge a defendant's labeling when those studies do not actually "disprove [the defendant's] claims."  *Kwan v. SanMedica Int'l, LLC*, No. 14-3287, 2015 WL 848868, at *6 (N.D. Cal. Feb. 25, 2015) (*Kwan I*), *aff'd*, 854 F.3d 1088 (9th Cir. 2017).  For that reason, this Court can—and should—probe beyond Plaintiffs' characterization of the sources they cite to determine whether those sources actually "show a causal link" between the Products and the purported health harms Plaintiffs attribute to sucralose.  *Geffner v. Coca-Cola Co.*, 343 F. Supp. 3d 246, 253 (S.D.N.Y. 2018) (*Geffner I*), *aff'd*, 928 F.3d 198 (2d Cir. 2019) (*Geffner II*); *see also Alamilla*, 30 F. Supp. 3d at 944 (dismissing false advertising lawsuit where the "articles the plaintiffs cite . . . contradict the allegation upon which their entire complaint hinges").

For example, several courts have dismissed lawsuits alleging that the use of the term "diet" to describe zero-calorie sodas was misleading based on studies purportedly showing that aspartame causes weight gain.  The Second Circuit affirmed the dismissal of a "diet soda" lawsuit because "[n]one of the

studies cited in the Complaint . . . establish a causal relationship between aspartame and weight gain." *Excevarria v. Dr. Pepper Snapple Grp., Inc.*, 764 F. App'x 108, 110 (2d Cir. 2019).  Multiple judges in this District have reached the same conclusion.  *See, e.g.*, *Becerra v. Coca-Cola Co.*, No. 17-5916, 2018 WL 1070823, at *4 (N.D. Cal. Feb. 27, 2018)  (dismissing "diet soda" lawsuit where the plaintiff's cited studies "all acknowledge that the question of *causation*, rather than *correlation*, remains undetermined") (emphasis in original); *Becerra v. Dr. Pepper/Seven-Up, Inc.*, No. 17-5921, 2018 WL 1569697, at *6 (N.D. Cal. Mar. 30, 2018) (*Dr. Pepper I*), *aff'd*, 945 F.3d 1225 (9th Cir. 2019) (*Dr. Pepper II*) (dismissing "diet soda" lawsuit where the plaintiff's cited studies "support merely a correlation or relationship between artificial sweeteners and weight gain, or risk of weight gain").

Other courts have likewise dismissed complaints where there is a "mismatch between the representations at issue and the evidence that allegedly debunks them."  *Eckler v. Wal-Mart Stores, Inc.*, No. 12-727, 2012 WL 5382218, at *3, 7 (S.D. Cal. Nov. 1, 2012) (dismissing lawsuit alleging that the labeling of glucosamine supplements falsely represented it was "formulated to help support joint comfort and rebuild cartilage and lubricate joints" in light of studies purporting to show that glucosamine "doesn't alleviate the symptoms of osteoarthritis in the hip and knee"); *see also, e.g.*, *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 137 (E.D.N.Y. 2015) (dismissing lawsuit challenging the labeling of Centrum vitamins where "there is a fundamental mismatch between [the] studies and the Centrum statements that plaintiffs attack").  As the *Eckler* court explained, a court can—and should—consider at the pleading stage what the plaintiff's cited studies do (and do not) say.  If "the studies . . . wouldn't show what [the plaintiff] claims they do," a court is "left with no facts from which to infer that [the defendant] is liable for false advertising."  *Eckler*, 2012 WL 5382218, at *6; *see also, e.g.*, *Amado v. Procter & Gamble Co.*, No. 22-5427, 2023 WL 3898984, at *7–8 (N.D. Cal. June 8, 2023) (dismissing lawsuit alleging that "appetite control," "blood sugar," and "digestive health" representations on Metamucil were misleading and noting that "the studies on which plaintiffs rely . . . fail to support their allegations").

Here, Plaintiffs cite dozens of studies and meta-analyses to argue that sucralose is unsafe.  *See* FAC ¶¶ 30–44.  But none of those studies establish that sucralose—when consumed in the doses individuals typically consume—is unsafe.  *See Kwan II*, 854 F.3d at 1098 (affirming dismissal of false advertising lawsuit where the plaintiff attacked the scientific substantiation for the defendant's claims, but

"failed to allege facts that would support a finding the defendant's marketing claims were actually false").[6]
To be clear, this motion to dismiss does not rely on the many articles that criticize the flawed assumptions and methodologies in Plaintiffs' cited studies. That is for another day. The key point for this motion is that the studies Plaintiffs cite—even taken on their own terms—do not plausibly establish that sucralose is unhealthy, that the Products are not suitable for people with diabetes, or that TC Heartland's labeling is false or misleading in any way. That is so for at least three independent reasons:

        1.        <u>The studies Plaintiffs cite do not establish causation or foreclose reverse causation.</u>

The studies Plaintiffs cite concede again and again that there is no "irrefutable proof that NNS [non-nutritive sweeteners] cause metabolic disorders in human subjects." Ex. 1, at 8; *see also* Ex. 2, at 11 ("The effects of sucralose consumption on the human gut microbiota are still a matter of debate."). As one of Plaintiffs' cited sources notes, "some studies found positive associations between NNS consumption and weight gain, metabolic syndrome, and type 2 diabetes . . . although other studies did not." Ex. 1, at 2. The other studies Plaintiffs cite are similarly equivocal. *See, e.g.*, Ex. 7, at 431 (concluding that "data from several epidemiologic studies . . . suggest that frequent consumption of LCSs [low-calorie sweeteners] is associated with . . . risk of developing type 2 diabetes," but noting that "results from clinical studies that evaluate sucralose's effect . . . ***have been equivocal***"); Ex. 8, at 713 (noting that an "umbrella review" of studies involving artificially sweetened beverages suggested a relationship between their consumption and Type 2 diabetes, but that "***none of the associations were supported by strong evidence***"); Ex. 9, at 71 (concluding that subjects "who consumed artificial sweetening agents had higher insulin resistance as compared" to those "who had no artificial sweeteners," but emphasizing "***further studies are required to conclude a direct correlation . . .***"); Ex. 10, at 485 (concluding that "[s]ucralose may have effects on glucose metabolism," but that "***[f]urther studies are needed to***

---

[6] Critically, it is not sufficient for Plaintiffs to allege that there is insufficient evidence supporting TC Heartland's claims about the Products. Even if Plaintiffs could show that TC Heartland's advertising claims were unsubstantiated, California law "preclude[s] private citizens from bringing actions that allege that the challenged advertising language lack[s] proper scientific substantiation." *Kwan II*, 854 F.3d at 1095; *see also, e.g.*, *Spector v. Mondelēz Int'l, Inc.*, No. 15-4298, 2017 WL 4283711, at *9 (N.D. Ill. Sept. 27, 2017) (noting that it was "not necessary for the Court to resolve" methodological quibbles about the defendant's scientific testing, as the plaintiff's disagreement with the defendant's methodology "does not directly address the question at issue here of whether the [defendant's labeling] claim is false").

*confirm*"); Ex. 11, at 128–29 (opining that study findings "may imply that chronic exposure to sucralose leads firstly to increased insulin secretion, and later to reduction of insulin secretion," but that "***[f]urther research is needed*** to investigate the clinical significance of these results"); Ex. 12, at 7 (noting that the "effects of artificial sweeteners on glucose metabolism remain unclear" and that "further experimental studies are needed to clarify the underlying mechanisms"); Ex. 13, at 3 (explaining there is ***no "clear cut evidence-based picture"*** concerning the relationship between NNS and weight gain because "[m]any observational studies have reported contrasting results" and identifying weaknesses in "earlier studies [that] reported a positive correlation"); Ex. 14, at 21 (explaining that "[f]urther studies are needed to elucidate whether the changes observed in the intestinal microbiota in animals are present in humans and to study the effects of sweeteners for which evidence is not available so far").

Even if these studies might suggest a "correlation or relationship" between non-nutritive sweeteners and health harms, that does not mean sucralose consumption *causes* those harms. *Dr. Pepper I*, 2018 WL 1569697, at *6. Why? Because "correlation is not causation, neither for purposes of science nor the law." *Id.*; *see also, e.g.*, *Manuel v. Pepsi-Cola Co.*, No. 17-7955, 2018 WL 2269247, at *10 (S.D.N.Y. May 17, 2018) (dismissing "diet soda" lawsuit where the plaintiff's cited studies "point only to a non-causal association between NNS consumption and weight gain (or related health problems)"). Indeed, at least one of the studies Plaintiffs cite expressly cautions that "***causality cannot be established***" from the study results. Ex. 12, at 7. Because Plaintiffs' cited studies do not establish a causal relationship between sucralose and the health harms they allege (and in some cases expressly disclaim causation), those studies cannot substantiate Plaintiffs' implausible claim that Splenda *causes* these harms.

Plaintiffs' reliance on these sources is particularly specious because they acknowledge the possibility of "reverse causation"—*i.e.*, that "individuals who are likely to develop metabolic disease or are gaining weight choose to consume NNS as a strategy to reduce sugar and caloric intake." Ex. 1, at 2; *see also, e.g.*, Ex. 12, at 1, 3 (explaining that "reverse causality . . . may be particularly sensitive in this type of study" and that, despite efforts to control for it, the "potential for reverse causality cannot be eliminated"); Ex. 8, at 714 (noting that "studies of this topic may be prone to bias" since "consumers could choose these artificial products because they became ill . . . or experienced recent weight gain, which is known as reverse causation effect in epidemiology"); Ex. 13, at 3 (noting the "concern" that studies

1   evaluating "the effects of NNS might be confounded by reverse causality").[7]  Because the studies Plaintiffs

2   cite do not "rule out other factors" that may explain the purported association between sucralose

3   consumption and the health harms Plaintiffs allege, they cannot "plausibly support 'risk' or 'causation'"—

4   which is fatal to Plaintiffs' claims.  *Geffner I*, 343 F. Supp. 3d at 254; *see also Manuel*, 2018 WL 2269247,

5   at *12 ("Without evidence of causation, plaintiffs cannot establish actual deception.").

6              2.      Many of Plaintiffs' cited studies do not involve the Products—or even sucralose.

7          Many of the studies Plaintiffs cite concern sweeteners other than sucralose.  *See, e.g.*, Ex. 8, at 714

8   (noting that the studies the authors reviewed predominantly tested acesulfame potassium and aspartame

9   and that the studies involving sucralose "produced inconsistent findings"); Ex. 1, at 8 ("The finding on

10  the effects of NNS on gut microbiome in human subjects is limited to potential effects of saccharin").

11  Yet, as one study notes, "LCSs [low calorie sweeteners] are a structurally diverse group of chemicals," so

12  "results from 1 [low calorie sweetener] cannot be necessarily generalized to another."  Ex. 7, at 432.

13         As many courts have agreed, scientific studies cannot establish that a product is unsafe (or that a

14  defendant's labeling claims are false) if they do not even test the product at issue.  *See, e.g.*, *Spector*, 2017

15  WL 4283711 at *8 (dismissing false advertising lawsuit where the plaintiff's claims of falsity relied "on

16  a comment in a document about a different product that does not address the issue in the lawsuit"); *Eckler*,

17  2012 WL 5382218, at *6 (rejecting reliance on studies that did not test the product at issue); *Kwan I*, 2015

18  WL 848868, at *6 (dismissing complaint because it "cite[d] no study that disproves [the defendant's]

19  claims" and noting that none of the studies the plaintiff cited "studied or tested [the defendant's] formula").

20  That is especially so here, where Plaintiffs' cited studies indicate that test subjects responded differently

21  to sucralose than to other non-nutritive sweeteners.  *See, e.g.*, Ex. 12, at 8 (noting that "[r]esults suggest

22  positive associations between total artificial sweeteners and main types (aspartame and acesulfame-K in

23  particular) and higher T2D risk," but that "results for sucralose appeared to be less robust . . . and warrant

24

25

26  _____

    [7] Other studies hypothesize "that human individuals feature a personalized response" to non-nutritive
    sweeteners "possibly stemming from differences in their microbiota composition and function" and that

27  "'personalized nutrition' leading to 'personalized medical outcome' may underlie the variable nutritional
    effects noted in many multi-factorial diseases."  Ex. 15, at 5; *see also* Ex. 2, at 11 ("[W]e must consider

28  other sources of variation in these results, such as genetic background, diet habits, and lifestyles, which
    may modify the effects of sucralose on the human intestinal microbiome").

further investigation"); *see also* Ex. 16, at 19–20, 24 (explaining that "changes in microbiome composition . . . varied considerably among" the tested substances, including sweeteners, evidencing "the importance of evaluating each additive separately and not grouped by their functional class").  And even the studies that involved sucralose generally did not study Splenda-branded products, which contain a proprietary blend of dextrose, maltodextrin, and sucralose.  *See* FAC ¶ 9 (labels listing Splenda's ingredients).  To the extent Plaintiffs' cited studies did not test the Products, they cannot support a claim that the Products are unsafe or that TC Heartland's labeling is deceptive.

### 3.   Findings from animal studies cannot be extrapolated to humans.

Finally, many of the studies Plaintiffs cite involve rats, mice, fruit flies, or other non-human subjects.[8]  One of those studies is an in vitro animal study by Susan Schiffman of North Carolina State University, which involved sucralose-6 acetate—an "impurity" created "during the manufacturing process" that was allegedly found in some samples of sucralose produced by another manufacturer.  *See* Ex. 22, at 307.  But as Plaintiffs' cited publications recognize, "the relevance of these findings to human subjects is not clear."  Ex. 23, at 2530.  Because of the potential for mismatch, the Ninth Circuit has held that a party relying on animal studies must offer "analytical support for the extrapolation from animals to humans."  *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir. 2002).  Plaintiffs fail to do so.

To the contrary, Plaintiffs' own sources confirm that data from animal studies cannot be reliably extrapolated, since "data obtained from studies conducted in people often fail to replicate the metabolic outcomes observed in vitro and in animal models."  Ex. 23, at 2530; *see also* Ex. 6, at 431 (noting "discrepancies between findings in animal models and human research"); Ex. 24, at 210 (explaining that "results obtained in animal trials do not always accurately reflect outcomes in humans").  Unsurprisingly, another court specifically rejected similar animal studies purporting to show that sucralose is unsafe for humans as unreliable.  *See Sugar Ass'n v. McNeil-PPC, Inc.*, No. 04-10077, 2008 WL 11338092, at *4

---

[8] This is evident from many of the titles themselves.  *See, e.g.*, Ex. 17 (*Sucralose Induced Pancreatic Toxicity in Albino* **Rats***: Histomorphological Evidence*); Ex. 18 (*Gut Microbiome Response to Sucralose and Its Potential Role in Inducing Liver Inflammation in* **Mice**); Ex. 19 (*Splenda Alters Gut Microflora and Increases Intestinal P-Glycoprotein and Cytochrome P-450 in Male* **Rats**); Ex. 20 (*Sucralose Promotes Colitis-Associated Colorectal Cancer Risk in a* **Murine** *Model*); *see also, e.g.*, Ex. 21 (study testing effects of sucralose on fruit flies).

(C.D. Cal. July 21, 2008) (holding that the plaintiff "fail[ed] to provide the requisite analytical support for the extrapolation . . . from rats to humans").  This Court should do the same here.

**III.   Plaintiffs' Claims of Economic Injury Are Neither Cognizable Nor Plausible.**

Plaintiffs will likely argue that because this is a false advertising lawsuit seeking economic damages, they can state a plausible claim—even if they suffered no physical harm—so long as they allege that the Products' labeling caused consumers to pay a "price premium."  *See* FAC ¶ 6 ("In all cases, consumers are harmed by paying a premium for the health claims touted by Defendant that are untrue."). But absent any plausible allegation of physical harm, Plaintiffs' subjective dissatisfaction with the Products' labeling does not amount to a cognizable legal injury, which means they lack Article III standing.  And even if Plaintiffs had standing (which they do not), their claims still fail because they have not plausibly alleged that the Products' labeling is likely to deceive reasonable consumers.

**A.   Absent any plausible allegation that sucralose is unsafe, Plaintiffs have not suffered any cognizable physical or economic injury and therefore lack Article III standing.**

To satisfy Article III, Plaintiffs must plead "facts demonstrating" that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of [TC Heartland], and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact," they "must show that [they] . . . suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id*. at 339.

Here, while Plaintiffs allege that sucralose is unsafe, they do not allege that the Products caused them physical harm or made it more difficult to control their blood sugar.  Nor do Plaintiffs allege that the Products failed to serve their essential function as sweet, low-calorie food products.  Instead, Plaintiffs allege that the *labeling* of the Products resulted in an *economic* injury because they allegedly "would not have purchased the Products, or would not have paid as much for them, had [they] known they could not provide the advertised benefits."  FAC ¶¶ 16(d), 17(d), 18(d), 19(d).  Plaintiffs admit they "intend[] to purchase the Products . . . if [they] could be sure the Products were truthful and compliant with California and consumer protection laws"—or, in other words, that the problem is the Products' *labeling*, not the fact that they contain sucralose.  *Id.* ¶¶ 16(e), 17(e), 18(e), 19(e).

But absent any plausible allegation that the sucralose in the Products is harmful or that the Products did not function as intended, Plaintiffs' subjective dissatisfaction with the labeling does not amount to a cognizable economic injury. For example, in *Boysen v. Walgreen Co.*, Judge Illston dismissed a lawsuit alleging that Walgreens misrepresented its fruit juices as "safe and healthy despite the presence of lead and arsenic." No. 11-6262, 2012 WL 2953069, at *2 (N.D. Cal. July 19, 2012). In reaching that conclusion, Judge Illston first found that the plaintiff did not plausibly "allege that the levels of lead and arsenic contained in [Walgreens'] juices are likely to cause physical harm." *Id.* at *7. Absent any plausible allegation that the juices "may cause physical harm," "violate FDA guidelines for fruit juices," or "function less well than advertised," Judge Illston concluded, the fact that the amounts of heavy metals in the juices "were unsatisfactory to him" was "not sufficient to establish Article III injury in fact." *Id.*[9]

That reasoning applies with equal force here. Plaintiffs do not allege that the Products caused them physical harm or made it more difficult to manage their blood sugar. Nor do they claim the Products were not sweet or low in calories. To the contrary, Plaintiffs alleges that they repeatedly purchased the Products and want to buy them again. *See* FAC ¶¶ 16–20. Their only complaint about the Products is that they contain sucralose, which the labeling prominently discloses. The reason for that alleged concern, and the reason Plaintiffs allegedly would have "paid less" for the Products, is their belief that "sucralose has been shown to induce and worsen metabolic syndrome, obesity, and Type 2 diabetes." *Id.* ¶ 30.

But as explained above, Plaintiffs do not allege that the Products caused them to develop any of these health conditions or that they worsened these conditions. To the contrary, Plaintiffs Prescott and

---

[9] More recent "heavy metals" cases have reached the same conclusion. In *Kimca*, for example, the court dismissed a lawsuit challenging the labeling of baby food that allegedly contained "unsafe levels of heavy metals" and found that the plaintiffs did not allege a legally cognizable economic injury. 2022 WL 1213488, at *1. Absent a plausible allegation of physical harm or "risk of future harm," the court found that the plaintiffs could not establish that the products were "worth less" than what they paid, that they "did not perform their intended purpose," or that they "were worthless for any other reason." *Id.* at *9. And in *Gerber*, the court similarly found that the plaintiffs—who allegedly purchased baby food that contained heavy metals—lacked Article III standing. 2022 WL 10197651, at *10. As in *Boysen* and *Kimca*, the court agreed that the plaintiffs did not plausibly allege a physical injury or risk of physical harm, did not claim that the baby food they bought was "unsafe as to them" or their children, and did not allege that the food "failed to provide [their] children with nourishment or to otherwise perform as intended." *Id.* at *7–8. Absent any plausible allegation of physical harm, which the court described as a "necessary predicate to show economic harm," the *Gerber* court found that the plaintiffs' effort to manufacture an economic injury "runs afoul of logic" and dismissed their lawsuit. *Id.* at *5.

1  Tilker allege they were diagnosed with Type 2 diabetes in 2005 and 2008, more than ten years before they
2  brought this lawsuit arising out of their purchases of the Products in 2020, 2021, and 2023. *See id.*
3  ¶¶ 16(b), 17(b). Likewise, Plaintiff Garcia "learned he was pre-diabetic" "[p]rior to purchasing the
4  Products" in 2022 and 2023, and he does not allege they caused his condition to worsen. *Id.* ¶ 18. Plaintiff
5  Wilson is "non-diabetic" and does not allege that she suffers from any health conditions. *Id.* ¶ 19(c).
6  Because Plaintiffs have not plausibly alleged any physical harm arising from the purchase of the Products,
7  their subjective dissatisfaction with the labeling does not amount to a cognizable economic injury.

8  **B.   The Products' labeling is not likely to mislead reasonable consumers.**

9  Even assuming *arguendo* that Plaintiffs had alleged sufficient facts to "satisfy the requirements
10  for Article III standing," that "does not mean those same facts would be sufficient to state a claim."
11  *Satchell v. Sonic Notify, Inc.*, 234 F. Supp. 3d 996, 1001 (N.D. Cal. 2017). Here too, even if Plaintiffs'
12  allegations of economic injury were cognizable, Plaintiffs have not alleged that the Products' labeling is
13  deceptive—which is the mechanism through which any alleged economic injury would have taken place.

14  Plaintiffs challenge two sets of claims in this lawsuit: (1) the statements "suitable for people with
15  diabetes" and "#1 recommended brand by doctors and dieticians"; and (2) the statements "diabetes care"
16  and "helps manage blood sugar," which appear only on the labeling of the Diabetes Care shakes. Plaintiffs
17  allege that both sets of claims mislead consumers into believing that "the Products would be suitable for
18  and aid in managing . . . diabetes." FAC ¶¶ 4–5. But Plaintiffs' allegations fail to establish that the
19  labeling is likely to mislead reasonable consumers.

20  "[C]laims under the California consumer-protection statutes"—such as Plaintiffs' claims under the
21  UCL, FAL, and CLRA—"are governed by the reasonable consumer test." *Dr. Pepper II*, 945 F.3d at
22  1228.[10] This "requires more than a mere possibility that [the] label might conceivably be misunderstood
23  by some few consumers viewing it in an unreasonable manner." *Id.* Rather, it "requires a *probability* that
24  a significant portion of the general consuming public or of targeted consumers, acting reasonably in the
25  circumstances, could be misled." *Id.* at 1228–29. In other words, the dispositive question is "whether the

26

27

28

---

[10] The same "reasonable consumer" standard governs Plaintiffs' claims for breach of express warranty and unjust enrichment. *See Weiss v. Trader Joe's Co.*, 838 F. App'x 302, 303 (9th Cir. 2021); *Girard v. Toyota Motor Sales, U.S.A., Inc.*, 316 F. App'x 561, 563 (9th Cir. 2008).

1  labeling of the products is misleading as a whole."  *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093,

2  1099 (9th Cir. 2023).  For that reason, "product packaging should be examined in its full context because

3  it would be unreasonable to cherry-pick discrete statements to prove deception."  *Weiss*, 838 F. App'x at

4  303.  Viewed through that lens, none of the statements Plaintiffs challenge are even remotely deceptive.

5  <u>1.  The phrase "suitable for people with diabetes" is not misleading.</u>

6  The phrase "suitable for people with diabetes" does not suggest that the Products are "uniquely

7  healthy" or capable of treating diabetes.  Instead, it communicates that the Products are appropriate for

8  people with diabetes *because* they do not contain sugar.  Two aspects of the labeling make this clear:

9  First, the phrase "suitable for people with diabetes"—which is the *only* challenged representation

10  on the labeling of Splenda Sweetener Minis, Liquid Sweetener, Water Enhancer, Sweet Tea, and Multi-

11  Use Syrup—appears only in small print on the back label next to the Nutrition Facts panel and the

12  ingredient list.  *See* FAC ¶ 9 & Exs. 4–8.  If a consumer reviewed the back label before purchasing the

13  Products, the Nutrition Facts and ingredient list—which appear next to this statement—would make clear

14  that each Product contains sucralose and is free of sugar.  That consumer could not reasonably construe

15  the statement "suitable for people with diabetes" to convey anything *other* than the absence of sugar.  *See,*

16  *e.g.*, *Hodges v. King's Hawaiian Bakery W., Inc.*, No. 21-4541, 2021 WL 5178826, at *7 (N.D. Cal. Nov.

17  8, 2021) ("A reasonable consumer is not free to ignore the ingredient list on a food package.").

18  Even Plaintiffs read the labels this way.  When they first purport to describe "The Deception,"

19  Plaintiffs allege that TC Heartland "misleads reasonable consumers, including Plaintiffs, into believing

20  the Products are healthy *sugar alternatives and sugar-alternative drinks*."  FAC ¶ 11.  Plaintiff Garcia

21  specifically alleges that he purchased the Products because he "wanted a healthier *sugar alternative*."  *Id.*

22  ¶ 18(c).  And Plaintiffs allege that the Products make "implied health claims" because they suggest that

23  they "are a *healthy alternative to sugar*."  *Id.* ¶ 25.  In other words, Plaintiffs admit that they were drawn

24  to the Products **because they are free of sugar.**

25  <u>Second</u>, the labeling of each Product includes *other* representations that emphasize the absence of

26  sugar, such as "Zero Calorie Sweetener," "No Added Sugar," "Tastes Like Sugar," "0 Sugar Calories

27  Carbs," and "Sugar Free"—all of which are more prominent than the tiny "suitable" statement on the back.

28  *See id.* ¶ 9.  Viewed as a whole, the labeling makes clear that the Products are "suitable for people with

diabetes" *because* they are free of sugar.  *See Weiss*, 838 F. App'x at 303; *Kennard v. Kellogg Sales Co.*, No. 21-7211, 2022 WL 4241659, at *4 (N.D. Cal. Sept. 14, 2022) (dismissing lawsuit challenging labeling of vegetarian products as "veggie" products where "the majority of the photographs on the packaging show the Products clearly mimicking meat as vegetarian meat substitutes," such that "[c]onsumers can also readily identify the actual ingredients in the Veggie Products from the ingredient list").

*Hartwich v. Kroger Co.*, No. 20-1253, 2021 WL 4519019 (C.D. Cal. Sept. 20, 2021), is instructive. There, the plaintiffs alleged that the labeling of Kroger Infants' Pain & Fever Acetaminophen—which included the phrases "Age 2–3 Years" and "Infants' Pain and Fever"—"misleadingly implie[d] the Product 'has some special medicinal property uniquely for infants" who are 2-3 years old, when the product in fact "contain[ed] the same concentration of acetaminophen" as "the Children's Ages 2 to 11 Product, which is cheaper." *Id.* at *5.  The court dismissed this lawsuit and found that the plaintiffs' theory "strain[ed] credulity." *Id.* at *5–6.  As the court explained, "a reasonable consumer could not plausibly conclude" that the challenged claims "impl[ied] anything about the Product's pharmacological composition, other than it is appropriate for children in the stated age range." *Id.*

That reasoning applies with equal force here.  The phrase "suitable for people with diabetes" does not mean that the Products are capable of curing or treating diabetes.  It means what it says: the Products are "suitable" for consumption by individuals with diabetes.  That message is effectively a restatement of the FDA regulation defining "[t]he use of an artificial sweetener in a food" as a "special dietary use" "for use in the diets of diabetics." 21 C.F.R. § 105.3(a)(2).  A reasonable consumer would not read it to imply anything else, including that Splenda non-calorie sweeteners are "uniquely healthy" or possess "some special medicinal property." *Solis v. Coty Inc.*, No. 22-400, 2023 WL 2394640, at *6–7 (S.D. Cal. Mar. 7, 2023) (dismissing claims alleging the labeling of cosmetics as "suitable for sensitive skin" was misleading because they were allegedly "unsafe due to the presence of purportedly harmful PFAS," as there was no "cogent nexus" between the challenged statement and plaintiff's alleged interpretation).

2.    "#1 recommended brand by doctors and dieticians" is also not misleading.

Plaintiffs' challenge to the statements "from the #1 sweetener brand recommended by doctors and dieticians" and "#1 recommended brand by doctors and dieticians" also fails because Plaintiffs plead no facts suggesting that Splenda is not the #1 sweetener brand recommended by doctors and dieticians.  Judge

1   Chesney recently dismissed claims challenging a "#1 Recommended Brand" label for precisely this

2   reason. *See Amado*, 2023 WL 3898984 at *1, 9–10 (granting motion to dismiss where plaintiffs "alleged

3   no facts plausibly establishing [the] falsity" of a "#1 Doctor Recommended Brand" statement on

4   Metamucil's label).  It is irrelevant whether Plaintiffs subjectively interpreted these statements to mean

5   that the Products are "healthy" or "provide diabetes and/or blood sugar management benefits." FAC ¶ 11.

6   The Ninth Circuit has made clear that "California's consumer protection laws do not require [a

7   manufacturer] to anticipate and affirmatively dispel . . . shoppers' idiosyncratic assumptions or wholly

8   incorrect interpretations of its advertising." *Thomas v. Costco Wholesale Corp.*, No. 21-55335, 2022 WL

9   636637, at *2 (9th Cir. Mar. 4, 2022).  Absent any plausible allegation that Splenda is *not* the "#1

10  recommended sweetener brand recommended by doctors and dieticians," this statement is not deceptive.

11              3.    The labeling of the "Diabetes Care" shakes is not misleading.

12          Finally, Plaintiffs challenge two other representations—the name "Diabetes Care" and the phrase

13  "helps manage blood sugar"—that appear *only* on the label of the Diabetes Care shakes.[11]   But these

14  claims are also not actionable, as the labeling of the Diabetes Care shakes makes clear that those claims

15  are based on the absence of sugar.  *See* FAC ¶ 9 & Ex. 1 (labels of Splenda Diabetes Care shakes showing

16  "0g no added sugars" statement immediately above "helps manage blood sugar").  These statements

17  accord with the FDA's finding that the "use of an artificial sweetener in food" in lieu of sugar is a "special

18  dietary use" appropriate for "the diets of diabetics." 21 C.F.R. § 105.3(a)(2); *see also Coca-Cola Bottling*

19  *Co.*, 563 F. Supp. at 1134 n.45 (noting that "[d]rinks with artificial sweeteners" are considered "special

20  dietary foods" under 21 C.F.R. § 105.3(a)(2)).  A reasonable consumer would not interpret the label as a

21  representation that the Diabetes Care shakes will cure or improve their diabetes.  *See Weiss*, 838 F. App'x

22  at 303 (holding that "[n]o reasonable consumer would interpret" the phrase "ionized to achieve the perfect

23  balance" on a bottled water label to "mean that the water itself will balance the consumer's own pH levels"

24  because "a reasonable consumer does not check her common sense at the door of the store").

25

26

27  ───────────────

28  [11] Similarly, while Plaintiffs include a passing allegation that carrageenan is harmful to people with
    diabetes, that allegation would not apply to any Product other than the Diabetes Care shake, which is the
    only Product that contains carrageenan.  *See* FAC ¶ 8 (depicting the Products' ingredient lists).

1    Plaintiffs will likely cite *Horti v. Nestle Healthcare Nutrition, Inc.*, No. 22-16832, 2023 WL

2    8613601, (9th Cir. Dec. 13, 2023), to argue that consumers could interpret the phrases "Diabetes Care"

3    and "helps manage blood sugar" to mean that Splenda Diabetes Care shakes are helpful in regulating blood

4    sugar.   But in contrast to *Horti*, Plaintiffs do not allege that the Products are "placed in stores and on

5    websites alongside legitimate diabetes treatments and other health and nutritional supplement products"

6    that could potentially "create a 'contextual inference' that the product may have a positive effect on the

7    regulation of blood sugar."   *Id.* at *2.   And in any event, *Horti* would not support Plaintiffs' claims

8    premised on the statements "suitable for people with diabetes" or "#1 recommended brand by doctors and

9    dieticians," which do not state—or even suggest—that the Products are capable of regulating blood

10   glucose levels.   The Ninth Circuit's decision in *Horti* does not salvage Plaintiffs' lawsuit.

11   **IV.    Plaintiffs' Request for "Corrective Advertising" Violates the First Amendment.**

12   While Plaintiffs claim that this lawsuit does "not seek to impose additional or conflicting labeling,

13   testing, or warning requirements" (FAC ¶ 52), their Prayer for Relief seeks an order "requiring Defendant

14   to engage in an affirmative advertising campaign to dispel the public misperception of the Products."   FAC

15   at 64 (Prayer for Relief).   But the Supreme Court has made clear that state law can only compel a party to

16   engage in "affirmative" speech—such as an "affirmative advertising campaign"—if the content of that

17   speech consists of "purely factual and uncontroversial information."   *Zauderer*, 471 U.S. at 651.

18   Here, as explained above, there is no serious scientific disagreement about the safety of sucralose.

19   But even if the safety of sucralose *were* up for discussion, a court-mandated warning regarding the

20   supposed risks of sucralose would violate the First Amendment by "elevat[ing] one side of a legitimately

21   unresolved scientific debate."   *Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*,

22   29 F.4th 468, 478 (9th Cir. 2022); *see also Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1283

23   (9th Cir. 2023) (holding that a Proposition 65 warning for glyphosate violated the First Amendment in

24   light of the "current vigorous debate surrounding the scientific validity of glyphosate's carcinogenicity").

25   Even if this Court allows this lawsuit to proceed, it should not permit Plaintiffs to conscript TC Heartland

26   into an unconstitutional "affirmative advertising campaign."

27                                          **CONCLUSION**

28   This Court should dismiss Plaintiffs' lawsuit with prejudice and without leave to amend.

1    DATED:  January 16, 2024            JENNER & BLOCK LLP

2                                  By:    _____
                                          /s/ Dean N. Panos
3                                         Dean N. Panos
                                          Alexander M. Smith
4                                         Kelly M. Morrison

5                                  Attorneys for Defendant TC Heartland, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28